Clifford Henry BOWEN,
Petitioner-Appellee,

v.

Gary D. MAYNARD, Warden,
Oklahoma State Penitentiary,
Respondent-Appellant.

No. 86–1136.

United States Court of Appeals,
Tenth Circuit.

June 25, 1986.

Robert A. Nance, Asst. Atty. Gen., Deputy Chief, Federal Div. (Michael C. Turpen, Atty. Gen. of Oklahoma, and Robert W. Cole, Asst. Atty. Gen., with him on brief), State of Okl., for respondent-appellant.

Jack B. Zimmermann (Jim E. Lavine of Zimmermann & Lavine, P.C., Houston, Tex., and Patrick A. Williams of Williams, Donovan and Savage, Tulsa, Okl., with him on brief), of Zimmermann & Lavine, P.C., Houston, Tex., for petitioner-appellee.

Before HOLLOWAY, Chief Judge, LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Clifford Henry Bowen has been incarcerated in the Oklahoma State Penitentiary under three death sentences for over five years. Convicted of a triple murder, Bowen maintains his innocence and argues that the State of Oklahoma violated his federal constitutional rights when it failed to disclose to the defense certain material concerning an early suspect in the case. Having considered the withheld material, we hold that it casts such grave doubt on the convictions that they cannot be permitted to stand. The prosecution had a federal constitutional duty to reveal the material

either with or without a specific request by the defense. We therefore affirm the district court's ruling that the convictions are constitutionally infirm.

## I.

### BACKGROUND

#### A. Procedural History

Bowen was arrested on August 28, 1980 and pled not guilty to an information charging him and Harold Behrens with three counts of first degree murder in violation of Okla.Stat.Ann. tit. 21, § 701.7 (West 1983). Behrens was convicted first in a separate trial and sentenced to life imprisonment. His conviction was affirmed by the Oklahoma Court of Criminal Appeals. *See Behrens v. Oklahoma,* 699 P.2d 156 (Okla.Crim.App.1985).

The case against Bowen was tried to a jury before Oklahoma County District Judge Raymond Naifeh. The jury returned three guilty verdicts and recommended death sentences on each count. Bowen filed a motion for new trial and then an amendment to that motion, alleging ineffective assistance of counsel. Judge Naifeh overruled the motion and signed the death warrants.

While his appeal was pending before the Oklahoma Court of Criminal Appeals, Bowen filed in that court a second motion for new trial alleging newly-discovered evidence and the failure to disclose exculpatory material. The Court of Criminal Appeals remanded the matter to the trial court to determine if an evidentiary hearing was appropriate. Judge Naifeh conducted hearings and filed findings of fact and conclusions of law overruling the second motion. The Court of Criminal Appeals affirmed Bowen's convictions. *See Bowen v. Oklahoma,* 715 P.2d 1093 (Okla. Crim.App.1984). The United States Supreme Court denied certiorari, *see Bowen v. Oklahoma,* — U.S. —, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985), and the Court of Criminal Appeals set Bowen's execution for August 12, 1985.

Bowen filed a petition for a writ of habeas corpus and an application for stay of execution in the United States District Court for the Western District of Oklahoma. He alleged denial of due process by the prosecution's withholding of exculpatory evidence and denial of effective assistance of counsel. United States District Judge Thomas R. Brett granted the stay and held an evidentiary hearing intended to supplement evidence taken in the state proceeding.

The federal district court filed an opinion and findings of fact and conclusions of law. The court set aside Bowen's convictions and issued the writ of habeas corpus, although it held that the State may re-try Bowen for the triple murder. The court based its decision on the withheld evidence and declined to reach the claim of ineffective assistance of counsel. The court thereafter denied the State's motion to stay Bowen's release pending appeal. The court provided several conditions for his release, including that Bowen be required to post a $100,000 appearance bond. The court stayed the effect of its decision pending disposition of a stay motion in this court. This panel heard oral argument on the State's motion to stay and denied the motion but stayed the effect of our order for seven days. Justice White stayed the writ of habeas corpus pending appeal before this court.

On the merits of its appeal, the State contends that (1) the federal district court erred in finding that the defense made a specific oral request for a list of other suspects, and (2) the withheld material is not exculpatory within the meaning of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

#### B. The Guest House Murders

A notorious triple murder occurred in Oklahoma City on July 6, 1980 at approximately 2:00 a.m. Ray Peters, Lawrence Evans, and Marvin Nowlin were fatally shot as they sat around a poolside table at the Guest House Inn motel. Although the murder weapon was not found, bullets and

shell casings recovered at the scene revealed that a .45 caliber automatic weapon with silver-tipped, hollow point bullets had been used. Several witnesses related that an unfamiliar man had been seen in the pool concession area before the shooting and that, after gunshots were heard, he ran and fled in a waiting vehicle.

Other information pointed in the direction of Harold Dean Behrens. Formerly a detective with the Oklahoma City Police Department, Behrens made his living selling drugs at the time of the crime. Ray Peters, alleged by the State to be the primary victim, worked for Behrens as a drug dealer. The month before his death, Peters had been arrested in Pauls Valley, Oklahoma on drunk driving and drug charges. Behrens had gotten Peters out of jail and was allegedly concerned about the excessive use of whiskey and Dilaudid by Peters, the loss of profits due to Peters' consumption of the goods, and the possibility that Peters would inform on him to the authorities. A short time before the shooting, Behrens and his lover Herman Borden had been sitting at the poolside table with Peters and various other people including the identification witnesses. Upon leaving the table and in full view of the stranger lurking in the concession area, Behrens put his hand on Peters' shoulder and said he would see him tomorrow. Jack Zumwalt, Behrens' former lover, testified at trial that it was not Behrens' custom to make physical contact with people upon parting company. The State argued that Behrens' gesture "fingered" Peters for the hit man.

Based on descriptions of the man seen in the pool area before the shooting, provided primarily by Mary Lee Chilton and Carrie Pitchford, a police flyer was circulated containing a composite sketch and bearing the following caption:

"SUSPECT WANTED FOR THE TRIPLE HOMICIDE OCCURRING AT THE GUEST HOUSE MOTEL AT 5200 N. CLASSEN AT 2:00 A.M. ON 7/06/80.

"SUSPECT: WM/50, 6′ 1″, 210–250 #, POT BELLIED, SALT AND PEPPER HAIR BEING MEDIUM LENGTH, WEARING A RED BASEBALL CAP, LONG SLEEVED BLUE SHIRT, FADED BLUE JEANS, BROWN WORK BOOTS LACED UP, HAVING A WEEK'S GROWTH BEARD.

"WEAPON USED: .45 CAL COLT AUTOMATIC

"AMMUNITION: WINCHESTER–WESTERN HOLLOW POINTS

"IF SUSPECT IS LOCATED, PLACE IN JAIL ON ABOVE CHARGE AND CONTACT DET. BOB HORN IN HOMICIDE DETAIL."

Def. trial ex. 1.

Upon hearing the description of the alleged assailant and the connection with Behrens, Detective Sergeant David McBride of the Oklahoma City Police Department thought of Clifford Henry Bowen. In 1975, McBride had headed the department's organized crime detail. Behrens was a detective under his supervision and brought information to the detail regarding a man named Jerry Ray James. Bowen was seen with James and became an object of surveillance. Toward the latter stages of the investigation, Behrens left the police department; shortly thereafter, James and Bowen were no longer seen in Oklahoma City. No charges against James or Bowen arose out of the investigation, although at trial the State relied on the investigation to buttress its theory that Behrens had retained Bowen as a professional hit man.

McBride recalled this investigation five years past and found the description of the suspect reminiscent of Bowen: "The salt and pepper hair. The big jaws, the pot belly. *The horn-rimmed glasses.* Several things that sounded exactly like him as I remembered him." Rec., vol. V, trial trans., vol. II, at 386–87 (emphasis added). McBride pulled a picture of Bowen from police records and brought the information to homicide detectives, who presented the picture to Chilton and Pitchford in a photo array consisting of two groups of five photos each. Group No. 1 featured Bowen without his customary horn-rimmed eye-

glasses. None of the men in the first group had mustaches. In Group No. 2, three of the five men, including the suspect Lee Crowe, *see infra* Part I(D), had mustaches. Both witnesses identified Bowen in the array and subsequently in a live lineup, although it is disputed whether Chilton also had positively identified a man named William Wayne Simmons from a photo array, and a police detective in a lineup. Chilton underwent hypnosis in an attempt to sharpen her memory of the events, but the fact that she had been hypnotized was never presented to the jury, *see* rec., vol. III, trial trans., vol. I, at 287–327, and it first appears in the record in the first motion for new trial, *see id.* vol. III, trial, trans., vol. III, at 913–15.

Following the identification of Bowen by Chilton and Pitchford, police obtained an arrest warrant on August 27. That same day an information was filed charging Harold Dean Behrens and John Doe with the murders. On August 29, Bowen was interrogated by Oklahoma City detectives with counsel present and was taken into custody. Bowen's name was substituted for John Doe on the information.

### C. The Trial

The case against Bowen rested upon the testimony of the two witnesses who had seen the man in the pool area. No fingerprint, ballistic, or other physical evidence tied him to the crime.

Mary Chilton worked at the Guest House as night office clerk. She testified that sometime after 12:15 a.m. she first observed a man standing in the pool concession area whom she did not recognize as a registered guest. He was at least six feet tall, weighed 200 to 250 pounds, and had salt and pepper hair, a medium-sized beer belly, and a slight growth of beard. He wore a red baseball cap, medium blue long-sleeved work shirt, blue jeans, and work boots. He was not wearing eyeglasses. His forehead was covered with the cap. The single most outstanding characteristic was that his face was pale, "a whitish gray color like he had not been out in the sun." Rec., vol. III, trial trans., vol. I, at 317.

She had observed the man at various moments between midnight and 2:00 a.m. and had walked within three feet of him in a well-lighted area.

Carrie Pitchford, a motel guest, testified that she had been sitting at the poolside table with Peters, Nowlin, Behrens, and others for much of the day and that she returned to her room between 1:15 and 1:30 a.m. She looked out the window, over a distance of eighty-five feet, and saw a "very large man" who was at least six feet tall and wore no glasses. Rec., vol. V, trial trans., vol. II, at 334, 356. His face appeared "very large" and "[v]ery, very white." *Id.* at 355. He wore a white T-shirt, jeans, and a bright red cap. His light-colored hair stuck out from under the cap, but she did not see any facial hair. The man had looked straight up at her, and she looked at him full in the face. The lighting "was similar to the stage in a grammar school.... The lighting was very good." *Id.* at 339; *see also id.* at 349. When she identified Bowen in court, Pitchford described him as he sat at counsel table as wearing glasses, and having gray hair and "a very light skin." *Id.* at 334–35.

Several other witnesses were presented to the jury in the State's case in chief. The manager of the Guest House, Promud Govind, testified that sometime after midnight he saw a man wearing a red ball cap standing in the concession area. When he heard gunshots, he saw from the motel office, 100 to 150 feet away, a man wearing a red cap with his hand raised and shooting.

Jack Zumwalt testified to his close business and personal relation with Behrens. He also related that the day after the murders he called Behrens, told him he had read about the killings in the newspaper, and asked him about it. Behrens said he did not have anything to do with it, although he had been there with Herman Borden. Behrens further stated that they had walked by the alleged assailant and that they too could have been shot. Several days later Zumwalt asked Behrens why it was Ray Peters and not Jim Powell, another drug dealer working for Behrens.

Behrens replied that "it was because he needed Jim." *Id.* at 425. On cross examination Zumwalt acknowledged that he had never heard Behrens mention Bowen.[1]

Alibi was Bowen's defense. He produced a parade of twelve witnesses who stated that Bowen had been at a rodeo in Tyler, Texas, some 300 miles from Oklahoma City, until approximately midnight on July 5. Bowen's wife and stepdaughter testified, as did four members of the Wheeler family, who owned the rodeo, and six other witnesses unrelated to Bowen or to the Wheelers. Dennis Wayne Blan, a bull rider, stated that he first met Bowen a month before July 5 and that he had ridden Hook 'em Henry, a bull named for Bowen, in the July 5 rodeo. Dennis' mother, Jerry, first met Bowen at the July 5 rodeo. Dennis' stepfather, David, had previously seen Bowen at the Wheeler Arena but was first introduced to him on July 5 by Johnny Wheeler as the man for whom Hook 'em Henry had been named. Janice Slee, the mother of another rodeo rider, testified that she attends two rodeos a year and first met Bowen on July 5. Johnny Wheeler testified that he telephoned Bowen at home in Tyler at 1:00 a.m. on July 6, just one hour before the murders, and that Bowen had answered the phone.

Bowen took the stand in his defense and denied committing the murders. He testified that he had been convicted of burglary in 1958 and of conspiracy to commit bank burglary in 1967 or 1968, for which he served time in federal prison. Bowen also stated that he had no regular employment, occasionally dealt in jewelry and real estate, and essentially made his living playing poker. Five witnesses also testified that Bowen was suntanned on July 5, although the State presented testimony that Bowen was light-complexioned at the time of his arrest in late August.

In rebuttal, the State presented what has come to be known as the jet airplane theory. It introduced testimony indicating that, even if Bowen had been at the rodeo late into the evening, he still could have made it to Oklahoma City in time to commit the murders if he had flown in a private jet taking off from an airstrip near the rodeo grounds and landing in the Downtown Airpark in Oklahoma City. However, the State introduced no evidence that Bowen had actually made such a flight. At the first motion for new trial, Bowen presented expert testimony that the Tyler airstrip was in fact abandoned and that neither it nor the Downtown Airpark could accommodate during darkness the kind of jet aircraft capable of flying from Tyler to Oklahoma City within the necessary time. One expert who had inspected the Tyler airstrip testified that a jet airplane would have left impressions on its surface and that a jet could not have taken off from that airstrip in at least two years. There was also testimony that other airports in Tyler and Oklahoma City would not accommodate the required time frame.

### D. The Lee Crowe Material

In April 1983, while Bowen's direct appeal was pending, his attorneys learned that Oklahoma City police had considered as a primary initial suspect in the murders a police lieutenant from South Carolina named Leonard Lee Crowe. From August 1980 until the trial in March 1981, information concerning Crowe was contained in reports in the file of the Oklahoma City Police Department. This material was known to one or both of the assistant district attorneys who prosecuted Bowen, and was possibly known to the district attorney himself, who was chief trial counsel. A second class of information, the Deana Burris testimony, was not known by either

---

1. Behrens did not testify at trial and has never testified in these proceedings except in an offer of proof at the first motion for new trial. At that hearing, Behrens stated that he did not know Bowen and had never seen him before that proceeding. He further testified that prosecutors had offered him a 10–year sentence in the federal penitentiary for his own three murder charges in exchange for his testimony that he knew Bowen. Behrens related his response to the offer: "I would gladly testify but I don't know the dude, you know. I would have testified but I don't know Clifton Bowen." Rec., vol. III, trial trans., vol. III, at 880.

the prosecution or defense until 1983.[2] Finally, some of the Lee Crowe material which was contained in the prosecution's file in 1980 was not obtained by the defense until the federal hearings in this case over five years later.

### 1. Material in State's File Introduced at State Hearing

Evidence was presented at the hearing on the second motion for new trial that the following information about Crowe was documented in the prosecution's file at the time of trial. Crowe, who matched the description of the shooter, was a white man, six feet two inches tall, weighing 225 pounds, with salt and pepper hair, a beer belly, a pale complexion, no mustache, and no eyeglasses. He occasionally wore a baseball cap and habitually carried a .45 caliber pistol with unusual and expensive silver-tipped, hollow point ammunition. Before the shootings, Crowe lived in North Charleston, South Carolina with Patsy Peters, the former wife of Ray Peters. In the first week of July 1980, Crowe and Patsy came to Oklahoma together and stayed with the Forgusons, Patsy's family, in Mannsville, Oklahoma, approximately 130 miles from Oklahoma City. While in Oklahoma, Patsy and Crowe had gone to Madill to visit Mae Margraves, the mother of Ray Peters. Margraves told police she thought it strange that Patsy did not introduce her companion, whom Margraves described as a white man in his late forties, six feet two inches tall, 225 pounds, with salt and pepper hair, and wearing a cap. Margie Forguson, Patsy's mother, told Oklahoma City detectives that on the night of the murders she and another daughter had gone to a Jehovah's Witnesses convention in Oklahoma City and that she believed Crowe stayed home with her husband. Crowe and Patsy left the Forgusons on July 6 and returned to South Carolina, where Crowe resumed his duties at the Hanahan Police Department. Shortly thereafter he resigned.

Oklahoma City detectives learned that sometime during the first week of July, Crowe had gone to Irving, Texas, where he applied for a position as a police officer. The detectives flew to Irving and obtained a photograph of Crowe taken just a few days before the murders. Although the photo shows Crowe with a mustache, when he returned to Hanahan on July 8 the mustache was gone. When police presented Crowe's picture to witnesses Chilton and Pitchford in Group No. 2 of the photo array, they used the picture taken in Irving although they knew that the suspect had no mustache and that Crowe had returned to South Carolina without a mustache.

South Carolina authorities furnished Oklahoma City police a fingerprint card and photograph of Crowe in uniform as well as spent casings from his .45 caliber pistol requalification. The fingerprint and ballistic evidence did not match the evidence from the murder scene.

By July 28, 1980, Oklahoma City detectives had learned from a confidential informant, reportedly Harold Behrens, that Peters was killed because he had "ripped off" Paul Mazzell, the reputed head of organized crime in Charleston, South Carolina, in a Dilaudid deal, and that the hit man had come from Charleston. See rec., vol. II, 2d motion trans., at 173–74.[3] Some of this information was contained in the district attorney's file at the time of trial in the "black book," see infra Part I(D)(3). A police report in the book, dated August 9, 1980, contained the following information provided by Behrens. Ray Peters had been involved in drug trafficking in Charleston. Approximately a year earlier, Peters' partner "Rick" had been abducted from a con-

---

**2.** Bowen's lawyers became aware of Crowe when they were contacted by South Carolina law enforcement agents regarding the second interview with Deana Burris. See infra Part I(D)(2).

**3.** The transcript of the 1983 hearing before Judge Naifeh on the second motion for new trial is referred to herein as "2d motion trans." The transcript of the 1981 hearing before Judge Naifeh on the first motion for new trial is contained in volume III of the trial transcript and is referred to as "1st motion trans."

venience store by two individuals and killed, and his body had never been recovered. Rick was killed "because he had double crossed some big time Dilaudid Dealers in Charleston, South Carolina. RAY PETERS was also suspected of double crossing the dealers...." Def. fed. habeas ex. 1A (report of B. Horn dated Aug. 9, 1980 regarding suspects Coy Hines, Jeno Hines, and Bubba Hines).

A written report by South Carolina law enforcement agent Dean Powell dated August 3, 1980 was introduced at the state hearing. Although this report was not in the prosecution's file, it does corroborate information contained in the file. The report stated that Ray Peters was involved in the Charleston Dilaudid trade with Ricky Seagreaves, and that Mazzell obtained his Dilaudid from Seagreaves, Peters, and Behrens through a source in Oklahoma City. Peters and Seagreaves supposedly cheated Mazzell in a Dilaudid deal in 1978. In October of that year, Seagreaves was kidnapped from a convenience store and had not been heard of since. Confidential informants in both Charleston and Oklahoma City reported that Danny Hogg and Eddie Merman kidnapped and killed Seagreaves for Mazzell. Lee Crowe was close to Danny Hogg and had been observed at Hogg's apartment before and after Crowe resigned from the Hanahan Police Department. South Carolina authorities considered Crowe the prime suspect in Peters' murder.

### 2. The Deana Burris Testimony

Information provided by a South Carolina woman named Deana Burris was not known by either the prosecution or the defense until 1983. Bowen offered the Burris testimony at the second motion for new trial as newly-discovered evidence.

Burris testified that in June 1980 she shared an apartment in Hanahan with Lee Crowe and Patsy Peters. She and Patsy worked out of the apartment as prostitutes and Crowe, who was with the Hanahan Police Department, provided them with "protection." Patsy was Crowe's girlfriend although Burris had had sexual intercourse with Crowe on one occasion. Over a period of several nights in June 1980, Burris heard Crowe and Patsy planning to kill Ray Peters. Patsy did not want Ray involved with their children. Crowe told Patsy to call Ray in Oklahoma and have him come to Charleston, where Crowe would kill him. Patsy called Ray, who declined. Ray subsequently told Burris that he would never come to Charleston because Patsy was living with a cop. Shortly after these conversations, in late June, Crowe and Patsy went to Oklahoma. Burris talked with Patsy on the telephone three or four times after Ray was killed. Each time Patsy inquired whether anyone had been asking questions about Crowe. Patsy told Burris to be quiet and to advise her of any inquiries about Crowe. Burris testified that during this period of time she was taking Quaaludes provided by Crowe but that her memory of the events was good.

Burris first told her story to South Carolina law enforcement agent Chad Caldwell in November 1981 in connection with his investigation of the Ricky Seagreaves kidnapping. At that time, Caldwell was unaware of the arrests or convictions in the Guest House murders and put little stock in Burris' story because he believed she was taking drugs. After learning that Bowen and Behrens had been convicted, Caldwell again interviewed Burris in April 1983. Burris was not then taking drugs and told the same story. Convinced of her truthfulness, Caldwell forwarded the first and second statements to Oklahoma City detectives.

Judge Naifeh found that the Burris testimony was not newly-discovered evidence sufficient to grant a new trial because the defense could have discovered the Crowe material with due diligence, Burris was not a credible witness, and the testimony would not have affected the verdict due to the overwhelming character of the identification evidence. Judge Brett concluded that the evidence at trial was better characterized as "adequate" and that the Burris testimony served to underscore the materi-

ality of the Crowe information although the testimony was neither newly-discovered evidence requiring a new trial nor exculpatory within the meaning of *Brady*.

### 3. The Black Book

Not until the first day of the federal hearings in October 1985 did the State produce the smoking gun of this litigation. Oklahoma City police maintain a loose-leaf binder containing all investigative reports and intelligence information regarding an open case. In August 1980 police turned over to the district attorney the "black book" concerning the Guest House murders. Although the existence of this book was mentioned by an Oklahoma City detective in the state hearings, it was provided to the defense only pursuant to subpoena during the federal proceedings. *See* def. fed. habeas ex. 1A. A copy of the investigative report concerning the suspect Leonard Lee Crowe, which was contained in the black book, is appended to this opinion.

The black book included the following information about Lee Crowe and Patsy and Ray Peters:

(a) When Patsy was younger she met Ray Peters, who was much older than she. Ray never actually married her but transported her to South Carolina, where she became a prostitute.

(b) Mae Margraves recalled that Ray had phoned Patsy a week or two before his death, and that he told her not to come to Oklahoma City because he did not want to see her but only his children. Ray threatened Patsy, telling her that if she came to Oklahoma City he would tell her parents what she really was. He then hung up the telephone.

(c) Patsy was engaged to Lee Crowe.

(d) Ray Peters' oldest son saw Ray slap Patsy outside the Margraves house, although this did not occur in Crowe's presence.

(e) Margie Forguson, Patsy's mother, never liked Ray because of the way he treated Patsy during their marriage. When talking to police, Mrs. Forguson appeared extremely nervous and uncomfortable.

(f) Lee Crowe had been employed by the Charleston, South Carolina Sheriff's Department but had been fired a few years before 1980. If Crowe did not leave the Hanahan Police Department as requested by his superiors, he would have been fired because of his involvement with known prostitutes and felons.

(g) Crowe had been under investigation by South Carolina law enforcement agents for the past year as a suspected hit man. On several occasions Crowe had left South Carolina and, upon his return, it was discovered that a homicide had occurred where he had been. (The defense apparently knew the substance of this information in 1983, *see* rec., vol. II, 2d motion trans., at 276, but the information does not appear in the record in such specific terms before the appearance of the black book.)

(h) South Carolina law enforcement agents who knew Crowe stated that he had an extremely high temper and that they believed he was capable of killing anyone for money.

(i) Crowe's former girlfriend had a boyfriend who persisted in bothering her. The boyfriend was later shot five times in the head with a small caliber pistol. When Crowe was asked to produce his gun, he said that he had lost it.

## II.

### THE PROSECUTION'S DUTY TO DISCLOSE

In *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The prosecution violates the *Brady* rule if after a request by the defense it suppresses evidence which is both favorable to the defense and material to guilt or punishment. *See Moore v. Illinois,* 408 U.S. 786, 794–95,

92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972).

At least prior to the Court's decision in *United States v. Bagley*, — U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the materiality of the evidence was judged according to three distinct standards. First, where the prosecution knew or should have known that its case included perjured testimony, the conviction will be overturned "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103–04, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976). Second, where defense counsel requests disclosure of particular evidence, the specific request puts the prosecution on notice of its obligation to disclose. In such a case, the verdict must be set aside if "the suppressed evidence might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398. Third, where the defense has made a general request for all *Brady* material, the prosecution is put on no better notice than if no request is made. Where there is no request or a general request, the judgment will be set aside "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402.

In its latest exposition of the standards of materiality, the Court in *Bagley* established a single test applicable to all instances of nondisclosure, including specific request, general request, and no request cases:

> "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Bagley*, 105 S.Ct. at 3384; *see also id.* at 3385 (White, J., joined by Burger, C.J., and Rehnquist, J., concurring in part and in judgment). This test was articulated subsequent to the trial in this case.

For the reasons set out below, we agree with the district court that Bowen's counsel made a specific request and that the Lee Crowe material meets the *Agurs* standard for such situations. We also agree that, even if no specific request had been made, the material satisfies the most restrictive standard in *Agurs* governing cases where only a general request or no request has been made. Finally, we agree that, although the material does meet the unitary *Bagley* standard, because both *Agurs* tests are satisfied there is no need to decide whether *Bagley* should be applied retroactively.

### III.

### THE ORAL REQUEST

■ Bowen's argument that he need only satisfy the *Agurs* test governing situations where a specific request was made rests on his assertion that his counsel made such a request orally. The State disagrees. Thus, we must first address whether defense counsel before trial made an oral[4] request for a list of other suspects. Such a request would be a specific request because it gives "the prosecutor notice of exactly what the defense desired," *Agurs*, 427 U.S. at 107, 96 S.Ct. at 2399, and is formulated in terms as precise as possible under the circumstances, *see Chaney v. Brown*, 730 F.2d 1334, 1341–42 (10th Cir. 1984), *cert. denied*, 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1985).

■ Judge Brett made the following finding of fact concerning the oral request:

---

**4.** We agree with the federal district court that a specific, oral request which is not on the record is legally equivalent to a formal, written motion when the parties agree that such a request was made. We do not decide under what other circumstances an oral, nonrecord request is legally sufficient as a request for specific exculpatory material. *Cf. Zeigler v. Callahan*, 659 F.2d 254, 269 n. 9 (1st Cir.1981) (issue not reached because oral request later waived); *Fleming v. Kemp*, 748 F.2d 1435, 1448 (11th Cir.1984) (ineffective assistance of counsel claim that counsel failed to file formal *Brady* motion held frivolous where counsel made oral request at pretrial conference), *cert. denied*, — U.S. ——, 106 S.Ct. 1286, 89 L.Ed.2d 593 (1985); *United States v. Montoya*, 716 F.2d 1340, 1345 (10th Cir.1983) (specific, oral request made on record at trial).

"13. There was no written motion, either general or specific, for exculpatory evidence filed by or on behalf of the petitioner before or during the trial. *At the hearing before the undersigned, it was conceded by the parties that approximately a month to six weeks before the jury trial, petitioner's counsel orally requested of the prosecutors (the District Attorney and his assistants assigned to the case) to be provided with the names of 'all other suspects.'* The prosecutors advised that at the time of the request there was only one suspect and that was Clifford Henry Bowen. On the day of trial, petitioner's counsel served a subpoena duces tecum on the Oklahoma City Police Department to produce its entire investigation file concerning the Guest House Motel murders. The information hereafter discussed concerning Leonard Lee Crowe was not produced by the Oklahoma City Police Department pursuant to the subpoena duces tecum."

Rec., vol. I, fed. habeas, doc. no. 39, at 10–11 (footnote omitted) (emphasis added).[5]

▐ The State contends Judge Naifeh found that no oral request had been made and that this finding must be presumed

correct under 28 U.S.C. § 2254(d) (1982). The State further contends Judge Brett erroneously found that in the federal hearing the State conceded a request had been made,[6] and that he failed to articulate his reasons for overriding the state determination as required by *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Bowen argues that the state findings do not preclude the possibility of an oral request and that, even if they do, the state record does not fairly support such a finding. He maintains further that the State's concession at the federal hearing establishes the error of the alleged state factual determination and that we must accept the federal district court's finding of a concession unless it is clearly erroneous. Bowen makes no attempt to deal with the requirements of *Sumner.*

### A. The State Court Findings

Judge Naifeh made the following findings which relate to a request by the defense for a list of other suspects:

"1. That no motion for discovery of exculpatory evidence was filed by trial defense counsel on behalf of the Defendant.

The district court ordered the State to advise whether the claims raised a factual issue, whether the factual issue had been resolved in the state proceedings, and whether an evidentiary hearing was necessary, in light of the circumstances outlined in 28 U.S.C. § 2254(d). The district court also directed the State to furnish transcripts and findings of the state proceedings in which the factual issue was allegedly resolved. After the court granted an evidentiary hearing, it stated that it would permit additional evidence not duplicative of that presented to the state court. *See* rec., vol. VI, fed. habeas, at 8. Under these circumstances, we believe the federal district court's grant of an evidentiary hearing was proper. *See Townsend v. Sain,* 372 U.S. 293, 310–19, 83 S.Ct. 745, 755–60, 9 L.Ed.2d 770 (1963); *see also Miller v. Fenton,* —— U.S. ——, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985); *La-Vallee v. Delle Rose,* 410 U.S. 690, 701 n. 2, 93 S.Ct. 1203, 1209 n. 2, 35 L.Ed.2d 637 (1973) (Marshall, J., dissenting); *White v. Estelle,* 556 F.2d 1366, 1368 n. 4 (5th Cir.1977); 17 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4265, at 670 (1978).

---

**5.** In reconstructing how he may have responded to a request for "all other suspects," the district attorney revealed that he distinguishes between "viable" suspects and former or eliminated suspects. He testified at the federal hearing that Bowen was the only viable suspect ever, but that, had the defense asked if he had considered other suspects, he probably would have produced the Lee Crowe material. *See* rec., vol. VIII, fed. habeas, at 21–23. The superficial appeal of this reasoning passes quickly. A public prosecutor is ethically bound to charge and try only those he believes, and can prove, are guilty. *See* Model Rules of Professional Conduct Rule 3.8(a) (1984); Model Code of Professional Responsibility DR 7–103(A) (1984). According to the district attorney's analysis, if a prosecutor believes that other "viable" suspects exist two months before a capital trial, he is obligated to dismiss the charges against the defendant. A request for all other suspects, therefore, must necessarily imply former or discarded suspects.

**6.** As an initial matter, the State urges that the federal district court erred in taking further testimony. We disagree. Bowen alleged that he had not received a full and fair opportunity to develop certain facts at the state hearing.

. . . .

"28. That the information regarding Crowe could have been discovered through the exercise of due diligence as the defendant could have requested a list of all suspects prior to trial but failed to do so.

. . . .

"36. That Frank Wright, an attorney for the Defendant, testified he orally asked the District Attorney if there were any other suspects and was told that none existed.

. . . .

"41. That the District Attorney's office considered the hypnosis of one witness, plus the arrest of a suspect named Simmons, to possibly be exculpatory evidence and that this information was provided to counsel for the Co-Defendant, Harold Behrens, pursuant to a "Brady" motion, but not given to Raymond Burger, trial counsel for the Defendant, because Mr. Burger made no request and apparently discovered this information before trial."

Rec., vol. I, fed. habeas, doc. no. 35, at 1, 5, 6, 8 app. The parties dispute whether these findings preclude the possibility that an oral, informal request was made by Mr. Wright. The Court of Criminal Appeals concluded that:

"Appellant alleges in his appeal and in his second motion for new trial that reversible error occurred when the prosecution failed to deliver exculpatory evidence to defense counsel. However, *the record does not reveal that defense counsel made a formal request for exculpatory evidence, though trial counsel contends he made an oral pretrial inquiry as to the existence of other suspects to which the prosecution answered in the negative.*

. . . .

"Appellant asserts the suppression of the allegedly exculpatory evidence regarding these suspects denied him due process of law under the authority of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, *as appellant recognizes, no request was made for exculpatory evidence prior to trial.*"

*Bowen,* 715 P.2d at 1098 (emphasis added).

■ It is unclear whether either the state trial court or the Court of Criminal Appeals implicitly decided that no informal, oral request had been made or rather did not reach the issue because they believed that an oral request was not legally equivalent to a motion or written request.[7] If either court did find that no request of any kind had been made, this would be a finding of historical fact, *see Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (citing *Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.)), entitled to a presumption of correctness by federal courts under 28 U.S.C. § 2254(d).

### B. The Federal Hearings

At the federal hearings several members of the defense team testified on the subject of oral requests. Trial counsel Burger stated that in early 1981 he had asked for exculpatory material generally and was shown a thin file which did not contain any such material. *See* rec., vol. VII, fed. habeas, at 15, 79–81. Co-counsel Frank Wright testified that in early 1981 he had made a direct oral inquiry of the district attorney regarding the existence of other suspects and was told that there were none. *See* rec., vol. VI, fed. habeas, at 114–16, 125, 132, 151–52; *see also id.* at 78–79 (testimony of Mike Evett); *id.* at 159 (testimony of Clifford Henry Bowen).

**7.** The State's proposed findings of fact and conclusions of law submitted to Judge Brett support the latter conclusion. There the State proposed as a finding: "The Court notes that both Judge Naifeh and the Oklahoma Court of Criminal Appeals considered this alleged oral request to be insufficient under Brady." Rec., vol. I, fed. habeas, doc. no. 35, at 34–36. *See infra* p. 607 for the full context of this statement.

In the closing arguments, the following colloquy took place between Judge Brett and Jack Zimmermann, Bowen's lawyer on appeal:

"THE COURT: Of course, we've also got a problem in this case that is somewhat troublesome to me. I take it the record shows clearly that, first, there was no discovery motion, particularly Brady motion, prior to trial, right?

"MR. ZIMMERMANN: There was no written motion prior to trial. That's what the record shows, yes, Your Honor.

"THE COURT: Does our record show that—at least, there is no dispute in the record that I've heard here, and from what [District Attorney] Macy said I take it he doesn't dispute it—that most probably sometime either in January of '81 or early February of '81 Mr. Macy, probably in the presence of one of his assistants where Mr. Frank Wright was present and probably also Mr. Burger was present, there was an oral request for information concerning any other suspects. Is this record clear here that that oral request was made and there is no dispute about that?

"MR. ZIMMERMANN: Yes, sir. If I may, here is what I believe there is no dispute about.

"THE COURT: All right.

"MR. ZIMMERMANN: There is no dispute there was any written Brady motion. There is no dispute—written by either Frank Wright or Raymond Burger. There is no dispute that there was only one specific request made orally, and that was for a list of suspects. There was no specific request for any other information, and we acknowledge that, we concede that.

"But the evidence is clear from the second motion for a new trial that Frank Wright specifically asked Bob Macy— Bob Macy had the opportunity to cross-examine and his only cross-examination question was to inquire as to the date that that meeting occurred. I think Mr. Macy also acknowledged today that there was a request for suspects. Mr. Burg-

er's uncontested testimony here, sponsored by the State, was that there was a specific request for suspects.

"THE COURT: All right. Well, I take it in your mind ... a request for other suspects, if made by Mr. Bowen's counsel, would in effect be a request for other suspects other than my client.

"MR. ZIMMERMANN: Yes, Your Honor, and I think it was clear it was in that context."

Rec., vol. IX, fed. habeas, at 22–24. Robert Nance, representing the State, voiced no objections to these assertions by defense counsel and the court. During his closing argument Nance and the court had the following exchange:

"THE COURT: Mr. Nance, do you agree that the state of our record here is essentially that an oral request was made by Mr. Frank Wright and/or Mr. Raymond Burger before Mr. Macy and/or one of his prosecutors on the prosecution team in the January, 1981 or early February '81 time frame for a list of all other suspects or all suspects? Does our record reflect that?

"MR. NANCE: Our record reflects and my notes—well, I don't recall exactly what I wrote, but yes, Mr. Wright asked the question. Mr. Macy, as I recall, didn't remember it.

"THE COURT: Well, my recollection is Mr. Wright stated it emphatically occurred. Mr. Burger stated it emphatically occurred. Both of them stated that the prosecutor replied there are no other suspects other than Clifford Henry Bowen. And *Mr. Macy today said, 'I don't recall the conversation, but if they say it took place I assume it did.'*

"MR. NANCE: I think that's correct.

"THE COURT. *So, is the state of our record here that that's undisputed?*

"MR. NANCE: *I'd say so in this proceeding.*"

*Id.* at 45–46 (emphasis added). Later in his argument Nance appeared to contradict these concessions when he stated that "[o]ur view is and continues to be at this

point that there was no request." *Id.* at 51.

■ From a review of the cold record, we can ascribe no other meaning to these statements than a concession, as Judge Brett found. The proposed findings of fact and conclusions of law which the State submitted to the federal court confirm that it did not dispute the existence of an oral request but argued instead that the request was legally insufficient:

"[T]he Court doubts that a casual question, sometime early in 1981, was sufficient to alert the prosecution that defense counsel wanted exculpatory material under *Brady. It appears from the testimony that a casual question was asked and honestly answered.* Mr. Wright evidently did not make any follow-up in order to clarify that his request was for exculpatory evidence within the meaning of *Brady.* At the evidentiary hearing conducted in the present case, Mr. Macy did not even recall the question being asked. If the desired information regarding other suspects was important enough to the defense to matter in trial, it is not unreasonable to require the defense to file a written motion for exculpatory evidence under *Brady....* The Court believes that a casual question, whether asked in the office, in the hallway, or outside the courtroom, does rise [sic] to the dignity of a request under *Brady* unless it firmly and unquestionably puts the prosecution on notice that the defense is inquiring about the exculpatory evidence.

"Mr. Wright's question fell far short of this standard. *He did not ask regarding rejected investigative leads or other persons who were suspects at other times. He only asked if there were someone else who might have committed the crime.* For reasons more fully set out below, the Lee Crowe material did not fit within that question. Therefore, there was no improper failure to disclose exculpatory evidence.

"The Court is reluctant to overturn a final criminal conviction, for the most serious of crimes, on collateral attack based upon a dimly remembered question asked years before.... The Court notes that both Judge Naifeh and the Oklahoma Court of Criminal Appeals considered this alleged oral request to be insufficient under *Brady....* The Court concludes that overturning this conviction based upon a single oral question, never followed by formal motion, would unduly interfere with the finality of legitimate state criminal judgments.... The Court simply does not believe that the question asked by Mr. Wright rose to the dignity of any request whatsoever under *Brady v. Maryland, supra,* and refuses to treat it as such."

Rec., vol. I, fed. habeas, doc. no. 35, at 34–36 (excerpt from State's proposed conclusions of law) (emphasis added).

The State now attempts to elude the finding of a concession. It first contends that its persistent avowed reliance on the state court findings is inconsistent with a concession that those findings are wrong. This argument not only assumes that the state court findings are complete and unambiguous but also fails to explain how a concession would not undermine those findings. Second, the State argues that Macy's lack of recollection precluded it from unequivocally asserting that no request had been made and that its silence on the issue does not constitute an affirmative concession. Unfortunately for the State, we cannot require the district courts to observe such semantic niceties. For the reasons set out below, we conclude that the finding of an oral request for other suspects is supported by both the federal and state court records and is not clearly erroneous. *See* rec., vol. III, 1st motion trans., at 905, 973; *id.* vol. II, 2d motion trans., at 12–13. It remains to be determined, however, what effect the presumption of correctness accorded state court findings by 28 U.S.C. § 2254(d) has on the district court's finding that the State conceded an oral request was made.

### C. *Overcoming the Presumption of Correctness*

■ As we have stated, if the state court did find that no request of any kind

had been made, federal courts must presume this finding correct unless one of the seven conditions specified in section 2254(d) applies.[8] If none of these conditions applies, or unless the habeas court concludes that the state court finding is not fairly supported by the record, the petitioner has the burden of establishing by convincing evidence that the state court finding is erroneous. *See Sumner*, 449 U.S. at 550, 101 S.Ct. at 770. The State's concession establishes that the facts material to the question of a specific, oral request were not adequately developed at the state court hearing. *See* 28 U.S.C. § 2254(d)(3); *cf.* rec., vol. III, 1st motion trans., at 905, 973. Moreover, to the extent the state court findings can be construed to imply that the defense made no specific, oral request for a list of other suspects, the concession convincingly establishes the error of that determination. Bowen therefore has amply met his burden under section 2254(d).

Remaining for our consideration is *Sumner's* requirement that a habeas court include in its opinion granting the writ the

reasoning which led it to conclude that one of the first seven factors was present, or the reasoning which led it to conclude that the state finding was not fairly supported by the record. *See Sumner*, 449 U.S. at 551, 101 S.Ct. at 771. The Supreme Court has stated that:

"Such a statement tying the generalities of § 2254(d) to the particular facts of the case at hand ... will have the obvious value of enabling courts of appeal and this Court to satisfy themselves that the congressional mandate has been complied with. No court reviewing the grant of an application for habeas corpus should be left to guess as to the habeas court's reasons for granting relief notwithstanding the provisions of § 2254(d)."

*Id.* at 551–52, 101 S.Ct. at 771. Accordingly, we must decide whether *Sumner* applies and, to the extent it does, whether its requirements were met in this instance.

At the outset, it is unclear whether *Sumner* is on all fours with the issue of the oral

---

**8.** Section 2254(d) provides:

"(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

28 U.S.C. § 2254(d).

request. In *Sumner* the Ninth Circuit reversed the conclusion of both the federal district court and the state courts by finding that a pretrial photographic identification procedure was impermissibly suggestive. The Ninth Circuit made this determination based on the identical record considered by the federal district and state courts and used the same constitutional standard. *See id.* at 543, 101 S.Ct. at 767. The Supreme Court noted that the Ninth Circuit failed to apply the presumption of correctness and did not even refer to section 2254(d) in its opinion. *See id.* at 547, 101 S.Ct. at 769. The Court criticized this apparent abrogation of the congressional mandate, noting that:

> "When Congress provided in § 2254(d) that a habeas court could *not* dispense with the 'presumption of correctness' embodied therein unless it concluded that the factual determinations were not supported by the record, it contemplated at least some reasoned written references to § 2254(d) and the state-court findings."

*Id.* at 549, 101 S.Ct. at 770 (emphasis in original); *cf.* S. Rep. No. 1797, 89th Cong., 2d Sess., *reprinted in* 1966 U.S. Code Cong. & Ad. News 3663, 3663–66.

Here, the federal district judge did not base his determination solely on the record considered by the state court but had the benefit of the concession, evidence not before the state judge. The district judge, moreover, repeatedly indicated his acute awareness of the presumption of correctness under section 2254(d). *See* rec., vol. I, fed. habeas, doc. no. 6, at 3; *id.*, doc. no. 39, at 24. Although the court's discussion of section 2254 appears to be linked more to the question of exculpatory evidence than to the oral request issue, the court did refer to the state court determination when it found the concession.[9] Apparently the district court did not deem it necessary to tie section 2254(d) to the oral request issue because it believed that the concession rendered the fact question moot.[10]

In our view, the district court adequately complied with the requirements of *Sumner* and section 2254(d). The concession constitutes the State's admission that the state court determination was erroneous to the extent it can be interpreted to mean that no oral request was made. This state of affairs is analogous to a stipulation of a given set of facts. The district court has explained the basis of its finding to our satisfaction and with due deference to the state court proceedings.

9. The court's footnote to this finding stated:
 "[2] There was no concession or stipulation at any hearings before the trial court that an oral request was made by the defendant for 'all other suspects' previous to the commencement of trial. Had such a stipulation been made, it would have required altering the trial court's Findings of Fact No. 28 and 41, which state that no such request for 'all other suspects' was made by or on behalf of the defendant prior to trial."
 Rec., vol. I, fed. habeas, doc. no. 39, at 11.

10. The following exchange took place at the hearing before the district court on the motion to stay:
 "THE COURT: On the record was it not stated to me, sitting as the Court in Oklahoma City at the hearing, that there was no disagreement that such a request was made? Isn't that in this record? At least I've read it in this record.
 "MR. NANCE: Well, Your Honor, if it's in the record I do not recall it. I don't recall it.
 "THE COURT: I specifically recall it. I asked, 'What is agreed on that subject? Was there an oral request or was there not an oral request?' And as I understood, the record specifically said that counsel agreed that there was an oral request made some four to six weeks before trial commenced in mid March of 1981. So obviously that was not before Judge Naifeh, was it?
 "MR. NANCE: That's correct.
 "THE COURT: Neither was it before any of these appellate tribunals.
 "MR. NANCE: Your Honor, excuse me. It may have been before Judge Naifeh. He may have—
 "THE COURT: That that was conceded?
 "MR. NANCE: Oh, not conceded.
 "THE COURT: He made a specific finding there was no such request, and when you gentlemen conceded before me there was such an oral request, that kind of lays that matter to rest, at least insofar as that being a fact."
 Rec., suppl. vol. I, trans., Jan. 23, 1986 hearing on motion to stay, at 14–15.

## IV.

### THE WITHHELD EVIDENCE

▮▮▮▮ Before we review the evidence to determine if a *Brady* violation occurred, we note that the question of materiality and the possible effect of the withheld evidence on the verdicts is a mixed question of fact and law. The state court's ultimate conclusion under *Brady* therefore is not entitled to a presumption of correctness under section 2254(d) and is open to review by federal courts. *Chaney*, 730 F.2d at 1344–46.

Bowen argues that the Lee Crowe material is exculpatory within the meaning of *Brady* because it could be used to impeach the identification witnesses and because it casts doubt upon his guilt. We will examine each of these contentions according to both of the *Agurs* tests as well as the *Bagley* test.

### A. The Lee Crowe Material as Impeachment Evidence

▮▮▮ Impeachment evidence merits the same constitutional treatment as exculpatory evidence. Suppression of material which could be used to impeach witnesses violates the Constitution if it deprives the defendant of a fair trial. *E.g., Bagley*, 105 S.Ct. at 3380–81 (evidence of bias); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (same). The case against Bowen stands or falls upon the testimony of the two identification witnesses. One of the assistant district attorneys who prosecuted Bowen agreed that in this case identification is a key issue. *See* rec., vol. II, 2d motion trans., at 223 (testimony of David Hardwicke). As the district attorney himself conceded, the evidence to convict would have been insufficient without the testimony of the two witnesses. He stated under cross examination:

"Q. If you take out the testimony of Mary Chilton, who had misidentified someone else earlier, and Carrie Pitchford, there is no case against Henry Bowen, is there?

A. There is not a total case. There is a partial case.

Q. Could you have gotten a conviction on the evidence that you had, subtracting Mary Chilton and Carrie Pitchford?

A. No.

. . . .

Q. Now, Mr. Macy, let me ask you this question. If the testimony of Mary Chilton and Carrie Pitchford had been impeached at trial significantly or their identification in court had been significantly attacked or impeached, is there a reasonable probability that Mr. Bowen would be free today?

A. There was a serious attempt to impeach it.

Q. That wasn't my question, Mr. Macy. Had they been impeached, because their testimony was the heart of the case, isn't there a reasonable probability that the verdict would have been not guilty?

A. That's true."

Rec., vol. VIII, fed. habeas, at 68 (testimony of Robert H. Macy). Thus, evidence impeaching these witnesses would take out the heart of the State's case and greatly undermine the guilty verdicts.

Had the defense team known about Lee Crowe, it could have made adroit use of his marked resemblance to the description of the suspect. Like the described suspect, Crowe was a white man, six feet tall, 225 pounds, with salt and pepper hair, a beer belly, pale complexion, and no eyeglasses. Crowe was in his late thirties, although Mae Margraves had described him as in his late forties, and the suspect was originally described as between thirty-five and fifty years old. Crowe was known to wear a baseball cap and in fact was wearing a cap when he and Patsy Peters visited Mae Margraves in Madill, Oklahoma just a short time before the shootings. Crowe also may not have had a mustache at the time of the murders because the evidence showed he had shaved his sometime between July 1 and July 8. The fact that Mae Margraves' description of Crowe did not mention a mustache makes it likely that the mustache was gone before July 6.

The State understandably makes much of the fact that the two witnesses chose Bowen and not Crowe from the photo arrays, and Bowen in a live lineup. Had the Lee Crowe material been made available to the defense, however, the frailties of these identification procedures would not have been difficult to demonstrate. As we have noted, Oklahoma City police used a picture of Crowe with a mustache although the described suspect had none and they knew that Crowe had shaved his mustache around the time of the murders. As we have also noted, the photo array featuring Crowe contained three of five men with mustaches, and the array featuring Bowen contained no men with mustaches. The picture of Bowen, moreover, showed him without the horn-rimmed eyeglasses he normally wore and which Detective McBride remembered so well, *see supra* p. 597. Although both Crowe and Bowen appear somewhat pale-complexioned in the photographs, an Oklahoma City detective testified that Crowe's picture appears paler than Bowen's. *See* rec., vol. II, 2d motion trans., at 160 (testimony of William L. Cook). In July 1980 South Carolina law enforcement agents described Crowe to Oklahoma City detectives as pale-complexioned, while the defense introduced testimony at trial that Bowen was suntanned at the time of the murders. When the State attempted to counter this evidence, it produced testimony only that Bowen was pale at the time of his arrest in late August. Judge Brett viewed Bowen in person and found that his complexion is medium and capable of tanning. When this finding was made, Bowen had been on death row for over four years and likely had had little exposure to the sun. The man seen loitering at the Guest House, moreover, wore a baseball cap, which may have obscured his features. Finally, although the witnesses did pick Bowen out of a live lineup, they were never given the chance to view Crowe in person. If the defense had known about Lee Crowe at trial, the reliability of the identification procedures could have been undermined and the witnesses impeached.

The State urges that *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706, is analogous. In *Moore* the Court found no *Brady* violation in the prosecution's failure to disclose certain statements of a witness named Sanders, who testified that the defendant had boasted in a bar called the Ponderosa Tap that he had shot a bartender in a nearby city. Although Sanders identified Moore at trial as the boaster, he previously had told police that the man was "Slick," who was a different person from the defendant. The Court stated:

"We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Here, the elusive 'Slick' was an early lead the police abandoned when eyewitnesses to the killing and witnesses to Moore's presence at the Ponderosa were found."

*Id.* at 795, 92 S.Ct. at 2568. Thus, the Court emphasized that two eyewitnesses had identified the defendant as a participant in the shooting and that two other witnesses besides Sanders had identified the defendant as the boaster. In contrast, the *only* identification evidence against Bowen was significantly impeachable with the withheld material. Additionally, there was no evidence that "Slick," unlike Crowe, had motive, opportunity, and ability to kill the bartender. *See infra* Part IV(B). We are not persuaded, therefore, that *Moore* controls our consideration of this appeal.

The testimony of Chilton and Pitchford as presented at trial may have supported the verdict, but, like much identification testimony, it was not flawless. Chilton's credibility is undermined by her hypnosis, and her possible misidentification of William Wayne Simmons in a photo array and a police detective in a lineup. Pitchford had viewed the suspect from a window eighty-five feet away. She said he wore a white T-shirt while Chilton said he wore a medium blue long-sleeved work shirt. Had the Lee Crowe material been disclosed to the defense, the backbone of the State's case might well have been irretrievably broken.

### B. The Lee Crowe Material Casts Doubt Upon Bowen's Guilt

█ As the State has reminded us, a *Brady* inquiry is grounded in an "overriding concern with the justice of the finding of guilt." *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401. On the state of the evidence, the Lee Crowe material creates reasonable doubt that Bowen committed the Guest House murders. Additionally, in the hands of the defense, it could have been used to uncover other leads and defense theories and to discredit the police investigation of the murders.

The only supportable motive Bowen could have had to commit the murders was money. The State proceeded on a theory of killing for hire, although it never proved that Bowen had been paid. In seeking the death penalty, the State initially charged that Bowen committed the murders for remuneration, but subsequently abandoned this allegation because it concededly had no proof of payment.

█ Lee Crowe, in contrast, could have been motivated by several factors. First, his fiancee Patsy had been married to one of the victims, Ray Peters, who had threatened and struck her just prior to his death. Deana Burris could have testified that Patsy wanted Ray dead and that Crowe was willing to kill him. Although the Burris testimony was not known to the prosecution at trial and therefore is not exculpatory within the meaning of *Brady*, an investigation of Crowe and Patsy might well have led to their former roommate. *See Bagley*, 105 S.Ct. at 3384 (incomplete response to specific request may effectively represent to defense that evidence does not exist and cause defense to abandon lines of independent investigation). Second, Crowe's ties with the Charleston, South Carolina organized crime syndicate and its connection with Ray Peters, *see supra* pp. 600–601, support a hypothesis that Crowe killed Peters. While this information was not in the prosecution's file, an investigation of Crowe undoubtedly would have led to the South Carolina authorities who had been investigating him for over a year. Third,

Crowe could have committed the murders for money alone, just as easily as Bowen. *Cf. Moore*, 408 U.S. 786, 92 S.Ct. 2562 (no evidence that misidentified suspect had motive).

The State vigorously contends that no one placed Crowe at the scene of the murders although two witnesses put Bowen there. We find unpersuasive this reliance on testimony which could have been impeached with the Lee Crowe material. Crowe had a distinct opportunity to commit the murders. By all accounts he and Patsy Peters were staying at the home of the Forgusons in Mannsville, Oklahoma. When Oklahoma City detectives interviewed Margie Forguson, she told them she was away on July 5 and 6 and believed that Crowe stayed home with her husband and Patsy on the night of July 5. An Oklahoma City detective testified that, when police finally interviewed Mr. C.B. Forguson in 1983, he stated that Crowe had stayed at the house that night. Aside from Mr. Forguson's possible bias and disingenuousness, we are left to wonder what time he retired that evening and whether Crowe still could have traveled the 130 miles to Oklahoma City by 2:00 a.m. In the six year history of this litigation, no one has ever sworn to being with Crowe on the night of the murders. These facts differ widely from the situation in *Moore*, 408 U.S. 786, 92 S.Ct. 2562, where Slick was never placed near the crime scene and the withheld evidence about him provided insignificant impeachment use, particularly in light of other identification witnesses.

Bowen, in contrast, offered twelve alibi witnesses who testified that he was at a rodeo in Tyler, Texas, 300 miles from the crime scene, until midnight to 1:00 a.m. The prosecution's attempt to rebut this testimony with the jet airplane theory is at best speculation and at worst fantasy. While it surely was the province of the jury to weigh the credibility of Bowen's alibi, the jury was never given the chance to learn about Lee Crowe. We believe that had that opportunity been given, Bowen's alibi would have been viewed in a different

light. *Cf. Chaney*, 730 F.2d at 1350–51 (withheld evidence would not have affected murder convictions where strong circumstantial evidence existed showing participation at least as aider and abettor).

Lastly, Crowe had the ability to commit the murders. He habitually carried the same kind of gun as the murder weapon and used the same unusual and expensive ammunition.[11] South Carolina law enforcement authorities believed he was capable of killing anyone for money.

The withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to Bowen's arrest and trial. A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation. *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985).

If the Lee Crowe material had been disclosed, the defense could have pointed out that Bowen was charged even though he had a confirmed alibi and Crowe did not. Crowe was eliminated as a suspect based on Mrs. Forguson's hearsay statement that she believed Crowe had stayed in Mannsville the night of the murders. Police did not substantiate or corroborate her statement of belief. Crowe was eliminated as a suspect even though police knew that he had ample motivation to kill Ray Peters. Also questionable were the identification procedures used to eliminate Crowe and to charge Bowen. The defense could have cross-examined the detectives about their decision to use the photograph of Crowe with a mustache when they knew that the described suspect had none and that Crowe had shaved his around the time of the murders. Why Crowe was never put in a live lineup is also troubling. With this material, a defense lawyer of less than heroic skill could have theorized that the State found it easier to charge an admitted gambler and ne'er-do-well rather than a police officer, even an allegedly corrupt one.

## C. The Duty to Disclose Existed Either With or Without a Request

 Because we hold that the defense made a specific request for a list of other suspects, the standard of materiality for judging the suppressed evidence is whether it might have affected the outcome of the trial. *See Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397. We need not take judicial notice of the vagaries of eyewitness accounts to state with assurance that the Lee Crowe material meets this standard. Alternatively, even if no request had been made, the withheld material "creates a reasonable doubt that did not otherwise exist" and therefore meets the test where a general or no request has been made. *See Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402. Where, as here, identity is in issue, a credible alibi defense is presented, and no physical evidence ties the defendant to the crime, material showing that someone resembling the defendant had motive, opportunity, and ability to commit the crime is "sufficient to undermine [our] confidence in the outcome" of the trial. The Crowe material also meets the *Bagley* requirement of a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 105 S.Ct. at 3384.

## V.

## CONCLUSION

 The orders of the federal district court setting aside the three murder convictions of Clifford Henry Bowen as constitutionally invalid, granting the writ of habeas corpus conditionally, and imposing conditions for Bowen's release includ-

---

**11.** The murder weapon was a .45 caliber automatic with Winchester Western silver-tipped, hollow point bullets. Crowe carried a .45 caliber handgun as his police service weapon and used silver-tipped bullets. At the time of the murders Winchester Western silver-tipped .45 caliber bullets had not been long on the market and thus were unusual. Rec., vol. II, 2d motion trans., at 49 (testimony of Chad Caldwell). Because silver-tipped bullets are too expensive for target practice, they have no real purpose but to kill people. *Id.* at 74.

ing the posting of a $100,000 appearance bond, are affirmed.[12] We also agree with the district court that the effect of its judgment in granting the writ of habeas corpus was to invalidate the convictions and death sentences for constitutional infirmities. Nonetheless, the information filed in state court charging Bowen with three counts of first degree murder has not been set aside, and retrial on these charges is not barred. *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961); *Bromley v. Crisp*, 561 F.2d 1351, 1364 & n. 13 (10th Cir.1977) (en banc), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499 (1978); *see also Blackledge v. Perry*, 417 U.S. 21, 31 n. 8, 94 S.Ct. 2098, 2104 n. 8, 40 L.Ed.2d 628 (1974). The State is also not barred, upon Bowen's release under the district court's order, from retaking custody of Bowen under the murder charges in the information, *see Irvin*, 366 U.S. at 728, 81 S.Ct. at 1645 ("[P]etitioner is still subject to custody under the indictment filed by the State...."), and seeking any protective orders under state procedure to ensure Bowen's appearance for retrial in accordance with state law. *Carter v. Rafferty*, 781 F.2d 993, 997–98 (3d Cir. 1986).

When the mandate issues, we will provide, as the State has requested, for a stay of fifteen days in order to afford the State an opportunity to seek a stay from the United States Supreme Court, or a Justice thereof, of the mandate and judgment of this court. If the State applies within such time for such a stay, our stay shall remain in effect pending disposition by the Supreme Court, or the Justice, of the State's application for a stay.

IT IS SO ORDERED.

---

12. Generally, a district court ruling in the petitioner's favor in a habeas case provides a reasonable time in order to afford the State an opportunity to re-try the defendant or otherwise correct the constitutional infirmity. *See, e.g., Carter v. Rafferty*, 781 F.2d 993, 994 n. 1 (3d Cir.1986); *Martinez v. Turner*, 461 F.2d 261, 265 (10th Cir.1972). In this case, the writ issued immediately. In light of the conditions of release imposed by the district court, *see supra* p. 596, to secure "Petitioner's appearance at all future proceedings herein," the Fed.R.App.P. 23(c) provision on immediate release, and the 28 U.S.C. § 2243 directive that the district court "dispose of the matter as law and justice require," we conclude that the district court in these circumstances did not abuse its discretion in ordering the immediate issuance of the writ of habeas corpus.

APPENDIX

| CRIME INCIDENT<br>FOLLOW UP REF: TRIPLE HOMICIDE | | | | INCIDENT NUMBER | | |
|---|---|---|---|---|---|---|
| LOCATION OF EVENT<br>5200 N. Classen Guest House Motel | | | VICTIM-REPORTING PERSON | | R & S D.O.B | |
| TIME OF EVENT<br>7-6-80 | RELATED INCIDENT NOS. | | RESIDENCE ADDRESS | | RESIDENCE PHONE | |
| REPORTING OFFICER<br>B. Horn | UNIT #<br>638 | COMM #<br>0214 | BUSINESS ADDRESS | | BUSINESS PHONE | |
| REPORT TIME<br>8-10-80 1:30 p.m. | TYPIST<br>gayer 8-10-80 10:30 pm | | BUSINESS NAME | | | |

| | | |
|---|---|---|
| **SUSPECT:** | | CROW, LEONARD LEE WM/39<br>Hanahan, South Carolina |
| **WITNESS:** | #1 | Sheriff Ron Goff<br>Madill, OK |
| | #2 | MAE MARGRAVES WF.50 |
| | #3 | FORGUSON, JIMMY WM/33 |
| | #4 | PETERS, AKA: FORGUSON, PATSY WM/25 |
| | #5 | JAMES CALDWELL<br>South Carolina Law Inforcement Agency |
| | #6 | M. DEAN POWELL<br>South Carolina Law Inforcement Agency |
| | #7 | Sgt. McIntosh, Ervin<br>Ervin Texas Police Department |
| | #8 | Cheif Conroy<br>Charleston, South Carolina Cheif of Police. |

BODY OF REPORT:

On 7-22-80 Det. B. Horn and B. Cook went to Madill Oklahoma to interview next to kin and attempt to obtain information on possible suspects in reference to triple homicide occurring at the Guest House Motel. Upon arriving in Madill Oklahoma, these Detectives interviewed Sheriff Ron Goff, who knows the victim RAYMOND PETERS.

Upon speaking to Sheriff Goff he recalls that RAYMOND PETERS ex-wife PATSY PETERS, was in the Madill area prior and during the death of her ex-husband RAYMOND PETERS. He also recalls a subject being with PATSY PETERS he described as 6'2", 225#, having salt and pepper hair. It should be noted that this subject matches the physical description of the suspect in the triple homicide.

Sheriff Goff advised that PATSY PETERS parents this being Mr. & Mrs. FORGUSON, live in Manville Oklahoma which is just north of Madill Oklahoma. He advised that Mr. FORGUSON is

SUPPLEMENTAL/MISCELLANEOUS REPORT OKLAHOMA CITY POLICE DEPARTMENT

| CRIME INCIDENT | | | | INCIDENT NUMBER | |
|---|---|---|---|---|---|
| TRIPLE HOMICIDE | | | | | |

| LOCATION OF EVENT | | | VICTIM-REPORTING PERSON | R & S | D.O.B. |
|---|---|---|---|---|---|
| | | | | | |

| TIME OF EVENT | RELATED INCIDENT NOS. | | RESIDENCE ADDRESS | | RESIDENCE PHONE |
|---|---|---|---|---|---|
| | | | | | |

| REPORTING OFFICER | | UNIT # | COMM # | BUSINESS ADDRESS | BUSINESS PHONE |
|---|---|---|---|---|---|
| B. HORN | | 638 | 0214 | | |

| REPORT TIME | TYPIST | | BUSINESS NAME | |
|---|---|---|---|---|
| | gayer | | | |

PAGE 2:

a farmer and had lived at this residence all of his life. He also advised that when PATSY was younger she had met RAYMOND PETERS, who was much older than she was and that RAYMOND PETERS never actually married her to South Carolina, where she became a prostitute.

These Detectives then went to MAE MARGRAVES residence, this being the mother of victim RAYMOND PETERS. Upon interviewing Mrs. MARGRAVES she advised that RAYMOND had lived in Madill most of his life and was an associate of JENO HINES. She also advised that RAYMOND had been married twice, his first wife being DIXIE PETERS, who still lives in Madill Oklahoma and his second wife was PATSY PETERS, who know resides in South Carolina. She recalls a phone conversation which was made from RAY to PATSY approx. a week or two weeks before RAY's death. During the phone conversation she recalls RAY telling PATSY not to come to Oklahoma City, because he did not want to see her. RAYMOND told PATSY that he just wanted to see his two children. RAYMOND threaten PATSY and advised her if she came to OKLAHOMA CITY to see him that he would contact PATSY's parents Mr. & Mrs. FORGUSON and tell them what she really was. RAYMOND then hanged up on PATSY, when Patsy arrived in OKC with the two children PATSY came to Mrs. MARGRAVES residence.

Upon coming to her residence she recalls a subject with PATSY, she described the subject as being a white male in his late 40's approx. 6'2", 225#, having salt and pepper hair and wearing some type of cap. She recalls that this subject did not say anything to anyone he just followed PATSY into the house with the two kids. Mrs. MARGRAVES though it was strange that PATSY talked to everyone but never identify the person who was with her. Mrs. MARGRAVES advised that the subject was at her residence a few days before RAYMOND was killed. Det. Cook advised that he interviewed RAYMOND PETERS oldest son and during the conversation with the son, he was advised that RAYMOND had slapped PATSY while standing outside the house. He also advised that the subject that was with PATSY was not present during this time. These Detectives also interviewed DIXIE PETERS while at Mrs. MARGRAVES residence.

DIXIE PETERS stated that she had not seen RAYMOND PETERS for approx. 6 or 7 years, the interview of DIXIE PETERS was then terminated at this point. MAY MARGRAVES advised that PATSY's parents lived in Manville, Okla. just north of Madill, Okla. MS. MARGRAVES gave the directions on how to get to the FERGUSON'S Residence. These Detectives then proceeded to Manville, Okla. Upon arrival first talked to the son of MS. FERGUSON, this being JIMMY FERGUSON, who lived in a house directly across the highway, MR. & MRS. FERGUSON. Upon interviewing JIMMY FERGUSON he advised that the subject with PATSY PETERS was her fiance LEE CROW, he advised that LEE CROW is a Chief of Police in South Carolina. JIM advised us to contact MRS. FERGUSON, this being his mother who lives across the street and talk to her because she has PATSY's new address and could give us more information in ref. to LEE CROW.

These Detectives then went across the street where officers met MRS. FERGUSON, MRS. FEGUSON advised that PATSY was engaged to a LEE CROW who is Chief of Police in Hanahan, So. Carolina. She further advised that PATSY had learned about the death of RAYMOND PETERS

SUPPLEMENTAL/MISCELLANEOUS REPORT OKLAHOMA CITY POLICE DEPARTMENT

| CRIME INCIDENT FOLLOW UP REF: TRIPLE HOMICIDE | | | | INCIDENT NUMBER | | |
|---|---|---|---|---|---|---|
| LOCATION OF EVENT | | | | VICTIM-REPORTING PERSON | R & S | D.O.B. |
| TIME OF EVENT | RELATED INCIDENT NOS. | | | RESIDENCE ADDRESS | | RESIDENCE PHONE |
| REPORTING OFFICER B. HORN | | UNIT # | COMM # | BUSINESS ADDRESS | | BUSINESS PHONE |
| REPORT TIME | TYPIST askey | | | BUSINESS NAME | | |

PAGE THREE:

when MAY MARGRAVES had contacted her early Sunday morning, 7-6-80. MRS. FERGUSON advised that she was at OKC at a religious convention 7-6-80 and her daughter PATSY along with LEE CROW and her husband were at Madill, Okla. MRS. FERGUSON advised that PATSY had two three year old children. She further advised that the children were at her residence now and that they are taking care of the children because PATSY and LEE CROW had gone back to So. Carolina early Sunday morning 7-6-80. She advised that LEE CROW was quitting his job in So. Carolina and was going to move to Okla. LEE had applied for a police job in Irving, Texas. They had gone back to pack their belongings to move back to their residence until he could locate a job. MRS. FERGUSON has never liked RAYMOND PETERS because of the way he had treated PATSY when they were married.

While talking to MRS. FERGUSON it appeared that she was extremely nervous and uncomfortable. She gave us a phone number and address so that we could contact PATSY in So. Carolina.

These Detectives then proceeded back to OKC and contacted Irving, Texas P.D. and spoke to Sgt. McINTOSH of the TRAINING division. Upon speaking to Sgt. McINTOSH he advised that LEONARD LEE CROW did apply as a police officer in Irving, Texas. He further advised that they have a photograph of LEONARD LEE CROW. LEE CROW was not accepted as an applicant because of his inability to pass the physical agility test. Sgt. McINTOSH advised that he would give us a copy of the photograph upon our request.

Upon contacting Charlston, So. Carolina these Detectives spoke to Chief Conroy of Charleston and he advised that LEONARD LEE CROW had been employed in the Sheriff's Dept. in Charleston but had been fired a few years ago, however, he is now employed in Hanahan, So. Carolina, this being a suburb of Charleston. LEE CROW is a Lt. in the Hanahan P.D. Upon advising Chief Conroy of the circumstances involved in the Homicide and also the suspicious nature of the event occuring around PATSY PETERS and her departure from Madill after the Homicide Chief Conroy advised that he had further information that he would give us, however, he first wanted to contact two So. Carolina agents and he would call us back at a later time and fill us in in ref. to LEONARD LEE CROW.

This Detective later received a phone call from JAMES CALDWELL and DEAN POWELL. They advised that they were law enforcement agents from So. Carolina and they wished to speak to me in ref. to CROWE. We were advised that LEONARD LEE CROWE was requested to leave the Hanahan P.D. or he would be fired because of his involvement with known prostitutes and felons. MR. POWELL advised that they had been investigating LEE CROWE for the past year on suspicion of being a hit man. He advised that on several occasions LEE CROWE would leave the state and upon returning they later discovered that where ever he had been had been a HOmicide. Upon advising MR. POWELL that the weapon that was used in the Homicide was a .45 Colt MR. POWELL advised that RAY PETERS carried a .45 automatic with him where ever he goes and he also uses silver tip hollow ammunition. It should be noted that this is the same type of amunition that was used in the triple homicide. Upon advising POWELL of information we received from HAROLD BEARINGS (CR) BEHRENS in ref. to a subject who is an associate of RAYMOND PETERS, known only as RICK. We asked POWELL if he had a homicide approx. one and a half years ago where a subject by the name of RICK was

**618**

SUPPLEMENTAL/MISCELLANEOUS REPORT OKLAHOMA CITY POLICE DEPARTMENT

| CRIME INCIDENT | | INCIDENT NUMBER | |
|---|---|---|---|
| FOLLOW UP REF: TRIPLE HOMICIDE | | | |

| LOCATION OF EVENT | | VICTIM-REPORTING PERSON | R & S | D.O.B. |
|---|---|---|---|---|
| | | | | |

| TIME OF EVENT | RELATED INCIDENT NOS. | RESIDENCE ADDRESS | RESIDENCE PHONE |
|---|---|---|---|
| | | | |

| REPORTING OFFICER | | UNIT # | COMM # | BUSINESS ADDRESS | BUSINESS PHONE |
|---|---|---|---|---|---|
| B. HORN | | | | | |

| REPORT TIME | TYPIST | BUSINESS NAME |
|---|---|---|
| | askey | |

PAGE FOUR:

abducted from a 7-11 store and taken out, put into a car, and his body was never recovered. MR. POWELL advised that they did have a incident which occured in which a RICKY SEGRAVES had been abducted at gun point from a convenience store by two subjects. He advised that this subject was never found. The main suspects in ref. to the disappearance of RICKY SEGRAVES was DANIEL HOGG and another unknown W/M, physical description 6'3", 250#'s. POWELL advised that it was suspicioned that RICKY, who is a distributor for dialoted had been holding money back from his connections and they contracted to kill RICKY SEGRAVES. MR. POWELL stated that LEE CROWE has an extremely high temper and that he believes that LEE is capable of killing anyone for money. He recalled an incident where LEE CROWE's ex-girlfriend had a boyfriend who kept bothering her and they had found the boyfriend later with five bullet holes in his head. The weapon that was used was a small caliber pistol and upon contacting LEE CROWE and asking him where his pistol was at he advised he had lost it. MR. POWELL advised that he would attempt to locate photographs and prints of LEE CROWE and send them to our dept. He further advised that he would come to OKC and bring further information. It also should be noted that when LEE CROWE left So. Carolina he had a mustache and upon returning to So. Carolina the mustache was shaved off.

These Detectives then went to Irving, Texas where we obtained a photograph of LEONARD LEE CROWE. A photo lineup was shown to witness and the witnesses did not identify LEE CROWE. Also a fingerprint card was obtained and comparison made with negative results. DEAN POWELL obtained several shell casings from LEE CROWE when he has practiced on the pistol range and has sent these shell casings to our dept. known comparison with the shell casing to the shell casing which was recovered at the crime scene. Officer Golightly advised that they did not match up.

DISPOSITION AND SUMMARY:

After reviewing the above information the suspect LEONARD LEE CROWE has been eliminated as a suspect, however, So. Carolina advised that they will continue their investigation and if further information is obtained they will contact our police dept. For further information in ref. to LEONARD LEE CROWE see follow up reports made by Det. Bill Harrison, Det. Bill Cook.