**Rita A. SILK–NAUNI, Petitioner,**

v.

**Larry A. FIELDS, Respondent.**

**No. CIV–85–1399–W.**

United States District Court,
W.D. Oklahoma.

Nov. 23, 1987.

Mahlon F. Perkins, Jr., Greenwich, Conn., Frank E. Deale, Center for Constitutional Rights, New York City, Douglas Parr, Native American Center Legal Program, Oklahoma City, Okl., for petitioner.

Michael C. Turpen, Atty. Gen., and Linda L. Gray, Asst. Atty. Gen., Oklahoma City, Okl., for respondent.

## ORDER

LEE R. WEST, District Judge.

Prior Opinions and Orders were entered in this case on January 23, 1987 and May 15, 1987 preliminary to the final consideration now being given to Petitioner's assertion that exculpatory evidence was unconstitutionally withheld during pretrial proceedings in the District Court of Oklahoma County in convictions attacked herein. The Opinion of January 23rd included a detailed review of the facts and authorities attendant to the Petitioner's claims in the Petition for Writ of Habeas Corpus resulting in denial of all claims for federal habeas corpus relief from the convictions for Manslaughter in the First Degree and Shooting with Intent to Kill except the claim of suppressed exculpatory evidence as defined by *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) and its progeny. In the May 15th Order the Court denied Respondent's claim that state remedies had not been exhausted and ordered production of the exculpatory evidence from the state prosecutor's files for in camera review. *Cf. United States v. Peters,* 625 F.2d 366, 371 (10th Cir.1980); *Lindsey v. King,* 769 F.2d 1034, 1041 (5th Cir.1985). The Court has completed its review of the submissions from the files of the Oklahoma County District Attorney, references to the state court record are indicated by the pagination noted on the document or the transcript (_____), and the Court's findings and conclusions follow:

I

Undoubtedly the most important factual eyewitness was the survivor of the fight with the Petitioner Rita Silk–Nauni (Silk–Nauni) and the victim of the Shooting with Intent to Kill charge, Airport Police Officer Teresa Wells (Wells). She accompanied and assisted Airport Police Officer Garland Garrison (Garrison) who was the victim of the Manslaughter in the First Degree charge, and she, therefore, was the key prosecution trial witness. An interview of Wells was conducted on or about September 19, 1979, the date of the shooting, while Wells was hospitalized for treatment of the gunshot wound, and the following statements were recorded by the interviewing officer:

> Sometime during the fight, the woman was able to remove the pistol from Officer Wells's (sic) holster and Officer Wells shouted to Officer Garrison that the woman had the gun, however due to the noise, Officer Garrison did not hear her. Officer Wells struggled with the woman, attempting to get the gun back, however the woman broke free and as she did so, pointed the gun at Officer Wells. Officer Wells stated that she shot at her 2 or 3 times, and that she went down on the ground. She observed Officer Garrison to run towards the woman, heard other gunshots and observed Officer Garrison to go down on the ground. She then stated that the woman told the boy to get in the car and that both the woman & the boy got into the Police vehicle of Officers Garrison and Wells's, (sic) and left going north on Meridian. (0687003–381)

On or about October 3, 1979 Officer Wells rendered a report summarizing her version of the altercation with Petitioner in the following terms:

> Subject then turned on myself and we struggled. I could not get her down on the ground and I could not get my handcuffs, nor did I have a slapper or nightstick. I used no brutality. I only tried to restrain her and protect myself. At this time, she broke loose from me and ran to GARRISON who was still attempting to get her son in the Scout Car. Subject grabbed GARRISON'S hand radio and attempted to hit him over the head and I jerked her back and the radio flew over the car. At this time, I called for back ups. Subject then turned on me. We struggled and somehow, her finger ended up in my trigger, gun still snapped, and holstered. I at that time hesitated and she pulled the revolver from the holster without unsnapping it. At that time, I faced her and yelled to GARRISON she had my revolver, at least three times. Evidently, he did not hear me. I then approached subject and we struggled with the gun but I could not get it back. I then backed away slowly and tried to reason with her, that this was not what she wanted, to drop the gun and just leave. Subject stepped towards me, approximately 1–1½ feet, and stated "I am going to kill you." and fired one shot hitting this officer in the upper left thigh. I at that time noticed her still aiming at me. I bent down and covered my head to make myself as small a target as I could.

> I do not know where GARRISON was, but I heard two, maybe three more rounds go by very close to my head and she and her son ran to the scout car and proceeded north on Meridian. At this time, I radioed in "Officer down" and subjects location in the scout car. I never saw GARRISON until I looked behind me about 20–25 feet and he was apparently dead. (0687003–372 to 0687003–373)

The interview witness reports include an interview with witness number 9, Pete Coxs (sic) who was an airport limousine service driver and a third-party witness of the crime scene:

> Coxs (sic) advised that as he left the terminal in route to meet his Boss Lucas, traveling north on Meridian, as he approached the 5400 blk. he observed an Airport Patrol Car, parked against the east curb of Meridian headed north, as he approached the Patrol car he observed Officer Garrison and Wells, who he knows personally, struggling with an I/F, down in the ditch, and in some weeds on the east side of Meridian. And

**1078**

that they were attempting to take the woman, back up to there (sic) car, and having quite a lot of trouble, doing so. Witness advised that he then pulled in front of the Patrol Car, was going to see if he could render assistance, he then noticed that there was also a small child apparently with this woman, and that the child was following the officers and the woman back up to the Patrol Car. He then stated that as the officers got the woman up to the car, it appeared to him that the officers had the situation in hand, and would not need his assistance. He then pulled off and proceeded north on Meridian, at which time as he looked in his rear view mirror, he could not see the woman subject any more, and assumed that the officers had already placed her in the rear seat of there (sic) vehicle. He advised he did observe officer Wells, to fall back away from the Patrol Car, and assumed that the woman subject had apparently kicked her away from the car. Witness Coxs (sic) advised that he did still see Officer Garrison standing up next to the Patrol Car, on the passenger side. Witness Coxs (sic) advised that this was the last part of the incident that he observed. Interview concluded. (0687003–370 to 0687003–371)

In pretrial motions and proceedings the Petitioner diligently sought production of the Wells' reports with all available legal remedies to no avail. For example, Petitioner filed numerous motions and applications to produce exculpatory evidence and evidence favorable to the accused detailing interviews with Wells and reports of those interviews, as well as interviews and reports following the interviews of the Petitioner's son, Derrick Nauni. (Criminal Appeal–Original Record 125–128). On April 25, 1980 at a pretrial motion hearing, the Petitioner unsuccessfully argued for production of the *Brady* materials and proffered that the undisclosed reports would reveal that Wells stated that she was shot prior to Garrison. (TR 22–30). Finally, an extraordinary Writ of Mandamus was filed and denied for lack of jurisdiction by the Court of Criminal Appeals for the State of Oklahoma.

Excerpts of the trial transcripts are included to be contrasted with the reports of Wells and Pete Cox, both of whom denied reviewing the police reports prior to testifying:

Officer Wells: (Direct Testimony)

A. As I was crawling out I heard a gunshot. And about that time I had got my balance and gotten out and was getting up. And as I was getting up an coming up to stand up I looked up and the Defendant was coming at with me with the gun.

Q. And who was that?

A. The Defendant was.

Q. What's her name?

A. Rita Nauni.

Q. This woman over here?

A. Yes, sir.

Q. Coming at you?

A. Yes, sir.

Q. Where was she when she was coming at you?

A. She was walking south. She was north of me.

Q. North of you?

A. Yes, sir.

Q. How far north of you?

A. I'd say about seven feet at that time.

Q. And she was walking towards you?

A. Walking towards me.

Q. What was she doing?

A. She pointed the gun at me. She said, "I'm going to kill you too, bitch." Just like that. And she fired a shot, and I fell. And I was still looking at her, and she was still aiming at me. And I knew she was going to kill me, so I just kind of doubled up and put my head under my arms, because I didn't want to see her kill me.

And I heard two rounds go over my head. And I—I must have passed out, because I came back to and I could hear her telling her son to get in the car. She said it three times real fast, just get in the car.

\*　　\*　　\*　　\*　　\*　　\*

Q. When you went down and you heard the first firing—Is that right?

A. Yes, sir.

Q. —where were you?

A. I was climbing out of that ravine.

Q. All right. And where was the boy then?

A. I don't know where he was then.

Q. Where was Garrison?

A. I don't know where Officer Garrison was.

Q. And when she fired at you, did she hit you on the first round?

A. Yes, sir; she did. Hit me in the thigh.

Q. That's the second round that you actually heard.

A. The second round, I heard. The first round, she fired at me.

Q. And what happened, please?

A. She hit me with that round, and I went down. And I looked up, and she was still shooting. And I just put my hands over my head.

Q. You were down on the ground at that time and that's when you just covered yourself up; is that right?

A. Yes, sir.

Q. Do you know where the boy was at that time?

A. No, sir.

Q. Did all of this take place here in Oklahoma County, the State of Oklahoma?

A. Yes, sir.

(TR VI, 1498–1503).

Pete Cox: (Direct Testimony)

Q. Did you constantly look—how did you watch them after you drove off then?

A. Well, as I was driving off I turned and looked at first, and I couldn't see too well. I wanted to move on because traffic was coming. And I just watched in my rearview mirror. In fact, I taken the rearview mirror in my hand and I watched it pretty close, you know, and adjusted it to where I could watch it.

Q. Okay. About how long in distance were you from where you saw the scout car until you made this turnoff?

A. About four blocks, sir.

Q. Okay. And how long did you watch them?

A. Until I lost sight, sir.

Q. All right.

A. Every minute of that time.

Q. Is that area sort of dipped down?

A. I wouldn't say it was dipped down; no, sir.

Q. All right. So you just lost sight of them.

Now did you see anything while you were watching them this way through the rearview mirror?

A. No. They seemed to pull away from the back of the police car.

I should have mentioned a while ago, Teresa Wells opened the back door of the police car, the one on the east side or the right side. She opened the door. And I thought they were going to put the lady in the car. And I assumed that everything was all right, but I still watched as I left.

Q. Then what happened, please, sir?

A. I—I went on to my appointment, sir. I didn't see anything else after I turned.

Q. All right.

(TR IV, 1034–1035).

The *Brady* rule imposes a duty on the prosecution under the due process clause that is equated with the fairness of the trial rather than the culpability of the prosecutor. The rule does not demand complete disclosure of the prosecutor's file as a discovery right of the Defendant and, thus, is not construed as a constitutionally created rule of discovery. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982); *United States v. George*, 778 F.2d 556, 561 (10th Cir.1985). The elements involved in a *Brady* analysis include the suppression by the prosecution of evidence, said evidence being favorable to the Petitioner and exculpatory in nature, and the evidence was material in terms of the outcome of the trial. *Talamante v. Romero*, 620 F.2d 784, 787 (10th Cir.1980); *United States v. Sink*, 586 F.2d 1041, 1051

(5th Cir.1978), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *Halliwell v. Strickland,* 747 F.2d 607, 609 (11th Cir.1984), *cert. denied,* 472 U.S. 1011, 105 S.Ct. 2711, 86 L.Ed.2d 726 (1985). Since the Court has heretofore found prima facie circumstances satisfying these elements, it was unnecessary to further analyze the subject material under the "reasonable probability" unitary test. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985); *Bowen v. Maynard,* 799 F.2d 593, 603 (10th Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 458, 93 L.Ed.2d 404.

When the suppressed evidence contained in the police reports is reviewed in light of the *Brady* elements and trial testimony its impeaching qualities are readily apparent as well as its probable value in cross-examination and in the overall presentation of the Petitioner's defenses. For example, the jury would have known that there were inconsistencies in the sequence of the shootings and that statements had been made that Officer Garrison was actually shot after Officer Wells, that the crucial inflammatory statement "I'm going to kill you too, bitch" attributed to the Petitioner either was not made or was not made as related in the trial testimony, and that the shooting of Officer Wells was not as "coldblooded" as portrayed. Also, the inflammatory statement would have had less impact in the prosecutor's closing arguments, and would not have occupied the prominence that it was accorded in the trial judge's consideration in imposing consecutive sentences. Therefore, it is the Court's Opinion that the suppressed evidence satisfies the most stringent test of materiality. This evidence was known to the prosecution and was withheld from the Petitioner and the jury despite repeated requests for its production. It possesses commonly recognized impeaching qualities and other pertinent factors affecting credibility. *United States v. Anderson,* 574 F.2d 1347, 1354 (5th Cir.1978). It is beyond peradventure that the *Brady* rule under federal and state court analysis includes not only exculpatory evidence but also evidence of an impeaching character. *Giglio v. United States,* 405 U.S. 150, 154–155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Reed v. State,* 657 P.2d 662, 664 (Okla.Crim.App.1983), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 307 (1983); *Brecheen v. State,* 732 P.2d 889, 896 (Okla.Crim.App.1987).

The character of the suppressed evidence in terms of the Constitutional due process fairness of the trial is most significant, it directly affects the credibility of the key witness, and there is a reasonable likelihood that this evidence, if produced, would have affected the verdicts of the jury as well as the sentencing consideration by the trial court. *Scurr v. Niccum,* 620 F.2d 186 (8th Cir.1980); *Monroe v. Blackburn,* 607 F.2d 148 (5th Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980); *Lindsey v. King, supra* at 1042–1043; *Anderson v. South Carolina,* 709 F.2d 887 (4th Cir.1983); *Simos v. Gray,* 356 F.Supp. 265 (E.D.Wis.1973).

## II

In this instance, the suppressed evidence directly related to the Petitioner's defense of insanity at the time the charged acts were committed and the jury's consideration of this defense. In general, the state may rely upon a presumption that the defendant is sane. *Ballou v. State,* 694 P.2d 949 (Okl.Cr.1985); *Adams v. State,* 292 P. 385 (Okla.Cr.1930). It is undisputed that Petitioner raised by sufficient evidence a reasonable doubt as to her sanity at the time of the crimes. The Petitioner having so challenged the presumption, the burden of proving the Petitioner's sanity beyond a reasonable doubt shifted and fell upon the state. *Ake v. State,* 663 P.2d 1 (Okl.Cr. 1983), *reversed* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1984); *Rogers v. State,* 634 P.2d 743 (Okl.Cr.1981).

The withheld material directly affected the determination of guilt and the sentence where Oklahoma law provides that the defendant is to be acquitted when she prevails with the defense of insanity. Pursuant to Okla.Stat. tit. 22, Section 1161, in effect at the time the Petitioner was charged and tried:

The jury must state in the verdict, if it is one of acquittal, whether the defendant is acquitted on the ground of insanity and where the defendant is acquitted on the ground that he or she, as the case may be, was insane at the time of the commission of the crime charged, such persons shall be discharged from further custody unless the court has reasonable grounds to believe that the release of such individual would be dangerous to the public peace or safety.

Okla.Stat. tit. 22 Section 1161 (as amended Laws 1975, c. 92, Section 1). The state of Oklahoma follows the M'Naghten rule on insanity so the defendant must demonstrate that she lacked the mental capacity to distinguish right and wrong, as applied to the particular act, and to understand the nature and consequences of such act. *Hair v. State,* 532 P.2d 72, 76 (Okl.Cr. 1974); *Suits v. State,* 507 P.2d 1261, 1264 (Okl.Cr.1973) (M'Naghten rule is exclusive test under Oklahoma law).

Jury determination that the defendant was insane at the time of the acts charged must result in a verdict of *acquittal,* not a conviction of a criminal offense. While the defendant acquitted because of insanity can be detained in custody, upon the requisite determination that the release of the individual would endanger the public peace or safety, this is substantially different from incarceration imposed as a consequence of guilty verdict. The potential consequence of a prevailing sanity defense ranges from no restraint to custodial detention which in duration may seem undifferentiated from the sentence imposed upon Silk–Nauni, 150 years of incarceration. The duration of the *sentence imposed* or the *noncriminal custody* is not a determinant in the Court's review.

In this case, the trial court rejected and refused to instruct on self defense, the Petitioner's other proffered defense. (TR X, 2459–61). Where the exculpatory material withheld by the state can be demonstrably related to the Petitioner's *only* defense, then the evidence denied is materially related to both the determination of guilt and the punishment imposed. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196.

The withheld evidence was significant in two respects: it was derived from the key witness for the state and it described the sequence of events at issue. The evidence bore upon Well's credibility and whether her factual account concurred with or contested the Petitioner's version. These elements, the credibility and the account, were critical to the jury's evaluation of all the facts and circumstances which could sustain the Petitioner's defense that she was insane at the time of the acts charged. That Petitioner shot and wounded Wells and killed Garrison was uncontested by the Petitioner. (TR VI, 1530). The primary participant-witness accounts of the acts charged were derived from Wells and the Petitioner. The only other participant, Petitioner's son, Derrick Nauni was ten years old at the time of the acts. He testified so as to concur with Petitioner's account of which officer was shot first. However, his testimony does not address the verbal exchange between Wells and the Petitioner. (TR VIII, 1973–1975).

At trial the Petitioner and Wells offered totally opposed factual accounts as to whether Wells or Garrison was shot first and whether such occurred as deliberative acts of the Petitioner. The suppression of Wells' prior statements which concurred with the Petitioner's account interfered with the truth-finding function of the jury. The fact finder could not apprise how the wounding of Wells and the fatal shooting of Garrison accorded with the Petitioner's account of same and if the latter's version of events related with the other evidence on her mental condition on September 19, 1979.

The evidence reveals that the Petitioner held and acted upon certain beliefs, some lacking a foundation in reality, and that such beliefs could have motivated the Petitioner's conduct during the course of the struggle and shooting of the two officers. In analyzing the relationship between belief and motivation and the Petitioner's mental condition, the Court does not need to determine which expert or lay witnesses' opinion on the Petitioner's sanity or lack of

such is correct. The defendant's and prosecution's expert witnesses differed as to whether the Petitioner could distinguish between right and wrong at the time of the shootings. The Petitioner's beliefs, some intensified to the stage of expressed fears, underlie the motivation for her conduct. The relationship between the evidence offered on the Petitioner's state of mind and her account that she first struggled with and wounded Wells and then fatally wounded Garrison can be evaluated for its effect on jury's evaluation of Nauni's sanity defense. The evaluation of this defense should have been based upon the totality of the circumstances, prior to and during the acts charged, and upon an accurate delineation of the interaction between Petitioner and the two officers.

The Petitioner provided uncontested evidence of a history of mental health problems, including two hospitalizations, one occurring in July 1979 and another in the 20-day period preceding the acts charged. Numerous witnesses testified to a number of fears expressed verbally and in non-verbal conduct by the Petitioner. She feared physical harm from her husband, Burke Pittman (Pittman), as well as from unknown persons and she feared that Pittman as well as unknown persons would harm her son, Derrick Nauni, or remove him from her. The Court will not address all the fears manifested by the Petitioner nor their appropriate diagnostic classification. The expert witnesses also disagreed on the degree to which some fears were delusional and whether Silk–Nauni was psychotic and unable to determine right from wrong. (TR VI, 1550, 1583, 1584, 1589; VII, 1798; IX, 2137–2138; X, 2402, 2445–2447).

The evidence before the Court sufficiently documents a sustained period of aberrational behavior derived, to some extent, from the Petitioner's fears for the safety of herself and her son. These aberrational acts resulted in documented episodes, some requiring hospitalization, and some which were observed by individuals who testified at the trial.

Prior to the acts charged, the Petitioner was voluntarily hospitalized for four days in July 1979 in California and nonvoluntarily admitted for care during September 1–6, 1979 in Bismarck, North Dakota. The Bismarck hospitalization arose after the Petitioner was found in the streets by the police and was exhibiting peculiar behavior, e.g., walking backwards, flicking a Bic lighter, chanting in an undecipherable manner. (TR VII, 1653–1658). Four officers were required to restrain the Petitioner and deliver her to St. Alexius Hospital for hospitalization in the psychiatric ward. Despite the medical advice to the contrary, the Petitioner and Pittman checked her out of St. Alexius and returned to California.

In the period after these hospitalizations, the Petitioner engaged in a series of acts related to her fears. The Court will not analyze or relate all such conduct but finds that the enduring concern for her son's safety or deprivation of his companionship can be demonstrably related to the events which occurred on September 19. The Court simply selects this fear out of those manifested by the Petitioner to illustrate the relationship between the suppressed evidence and the sanity defense.

The Petitioner exhibited a preoccupation to protect her son and to prevent Pittman or unidentified persons from removing Derrick Nauni from her custody and care. Prior to September 19, the Petitioner's sister described Silk–Nauni as very protective of her child. (TR VII, 1643). Approximately September 15, Silk–Nauni left the home she shared with Pittman and arranged to secure the return of her son to California. Thereafter, Nauni, with her son after his return, retreated to her brother's home, to restaurants, and to the airport to escape the harm Nauni felt was possible from Pittman and others. Witnesses testified to a stormy marital history between Nauni and Pittman which included him physically abusing her, so some basis existed for Petitioner's fear that she could be harmed. During these episodic efforts to escape harm there was also conduct which neither the Petitioner's sister-in-law, Darlys Darlene Silk, or her son considered ordinary or understandable in the circumstances. (TR IX, 2245–2269; VIII, 1960–1979). The sister-in-law, alarmed about Petitioner's condi-

tion and conduct, spoke to Silk–Nauni about admitting herself into a mental hospital. (TR IX, 2264–2265). Eventually Nauni and her son secured passage on a flight to Oklahoma City. During the flight to Oklahoma City, the airline attendant, Leslie Patricia McKean (McKean), testified that the Petitioner engaged in a series of unusual behaviors, e.g., complaining about undiscernable or imaginary water spills and paper trash, refusing to disembark from the plane, expressing the fear that the other passengers might touch her, and screaming intermittently. (TR VII, 1749–1779).

Petitioner specifically manifested a fear for her son's well-being, according to McKean. (TR VII, 1776). During the flight Silk–Nauni insisted on monitoring her son's use of the lavatory. She posted herself so as to observe him through the unclosed door of the lavatory and concurrently monitor the movement of passengers. (TR VII, 1755). To reach this monitoring position the Petitioner had suddenly rushed after her son, forcibly moving past the passengers and flight crew in aisle and the heavy serving equipment which the crew had to struggle to prevent from toppling. *Id.* After arriving in Oklahoma City, the Petitioner repeatedly refused to leave the plane.

During the course of attendants' efforts to persuade Silk–Nauni to leave the plane, a male flight attendant strode down the aisle. In response, the Petitioner backed her son against the aircraft wall and spread her arms in front of him as if "she was trying to protect her son from something." (TR VII, 1763). The evidence before the Court does not reveal facts or circumstances which demonstrate the Petitioner's fear or conduct in these two episodes as ordinary and reasonable.

After leaving the plane, Silk–Nauni and her son began walking away from the Oklahoma City airport and thereafter encountered officers Wells and Garrison. The officers responded to a call regarding the Petitioner's continuing unusual conduct. Silk–Nauni and her son were relieving the weight of their luggage by extract-

ing clothing and abandoning it along the roadside from the airport. She was accostive to persons who attempted to return the clothing. It is undisputed that when the officers approached Silk–Nauni and her son with regard to the littered clothing, there ensued a struggle. At some point Garrison attempted to restrain Derrick Nauni and to place him in the police car, while Wells attempted to achieve same with the Petitioner. In the Petitioner's testimony at trial she stated that she heard her son screaming, calling "Mama," and that her efforts were directed to respond to her son's plight, as she perceived it, and "to help" Derrick. (TR VIII, 2030).

By the prosecution and defenses evidence, Petitioner's concern for her son has been persistent. The prosecution's expert, Gerald Witten (Witten), testified to Petitioner's inclusion of the son in the picture Silk–Nauni drew in response to a figure drawing diagnostic tool, the Draw–A–Person test. (TR X, 2308–2320). Witten interpreted this inclusion as signifying the son's importance to the Petitioner. (*Id.* at 2320). The Petitioner's expert witness, Hans Von Brauchitsch testified that Silk–Nauni had delusions about the "larger environment," the external world, and that one delusionary fear was that Pittman or persons in a conspiracy with him or under his orders would take her son away. (TR IX, 2128–2131, 2196–2199).

Where the Petitioner persistently expressed a fear for her son's safety, and if, as witnesses testified such fear at times lacked an objective basis, this mental condition is directly related to Silk–Nauni's reaction to Garrison seizing her son. In keeping with a pervasive fear, it is not improbable that Garrison's acts were perceived by Petitioner as a direct physical threat to her son. During the encounter and struggle with the officers the Petitioner claims she made a concerted effort to reach her son and help him. The effort was the substance of her testimony at trial about the events on September 19 involving the officers. She testified to little, if any recall, of other details. (TR VIII, 2030–2058).

The Petitioner's account of her mental state and the underlying motivation is opposite to that testified by Wells. As the state's primary witness, Wells testified that Petitioner first shot Garrison, then deliberately turned on Wells, said "I'm going to kill you too, bitch." and thereafter shot Wells. According to Silk–Nauni, having shot Wells and escaped from her, Silk–Nauni then acted to help her son. She struggled with and shot Garrison in doing so. Immediately she ordered her son to get into the police car, which Silk–Nauni drove as they fled from the scene. The now-disclosed statements by Wells supports the Petitioner's account of what happened and when it happened. The Petitioner's account is supportive of her defense that her actions were those of a woman out of her mind, who lost touch with reality, and during the course of September 19 did not have the mental capacity to know right from wrong. (TR VI, 1520).

The state relied on the Well's account at trial to argue that the shooting of Garrison first and then of Wells demonstrated that Petitioner's acts were deliberate and intentional as indicated by sequence and verbal threat. In its closing, the state argued that Silk–Nauni used "so much cool, deliberate logic at the time she executed Garrison." (TR XI, 2533–2534). By shooting Garrison first, Petitioner allegedly removed the danger from this armed officer. The state further argued that in subsequently turning to and struggling with Wells, making the inflammatory statement *supra*, the Petitioner knew what she was doing. Furthermore, as the state argued, Petitioner "knew that she had to execute her [Wells]." (TR XI, 2530–2534, 2543). The Petitioner's account of sequence, now supported by Wells' two pretrial statements, is opposite as a factual account and undermines the inference of intent. In Wells' pretrial statements one includes *no* verbal threat and the other lacks the "bitch" language. The state based its case in chief and closing argument upon the sequence and language as testified at trial by Wells to demonstrate Petitioner's intent. That foundation is undermined by the content of Wells' pretrial statements.

With an uncontroverted account of the sequence of the struggle between the Petitioner and the two officers, the Petitioner would have benefited from the jury considering this factual account which accords with the Petitioner's version and that of the prosecution witness, Pete Cox, *supra*. This version is integral to Petitioner's beliefs, motivation and pre-existing mental condition. As the evidence related to Petitioner's apprehension for her son demonstrates, Silk–Nauni was motivated by fears, albeit some beliefs lacking a foundation in observable reality. Upon the diminution, if not removal of the deliberation and intent which Wells' testimony attributed to Silk–Nauni, the jury would have been presented with a different version of events on September 19 and could have reached a different verdict than the one rendered.

The pretrial denial to the Petitioner of Wells' two statements prevented the jury from considering the facts and circumstances in their totality and relating them to the Petitioner's insanity defense. The suppressed material interfered with the accuracy of the criminal proceeding at which the Petitioner's individual life and liberty were at risk. *Ake v. Oklahoma*, 470 U.S. 68, 78, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1984). The private interest at stake in Petitioner's trial was "uniquely compelling." *Id.* Wells' testimony constituted the heart of the state's case, that Petitioner was sane and with deliberation shot the two officers. The now disclosed statements impeach Wells and undermine the guilty verdict reached by the jury which resulted in the loss of Petitioner's liberty. *Bowen* 799 F.2d at 610. Had the jury the opportunity to learn of Wells' two pretrial statements it might have viewed in a different light the sequence of events and the Petitioner's conduct during the struggle and shooting of the two officers. *Bowen,* 799 F.2d at 612–613. There is reasonable probability that had the undisclosed evidence been revealed to the defense and the jury, the result of the trial would have been different. This reasonable probability undermines confidence in both the finding of

guilt and the consequent punishment. *Bowen,* 799 F.2d at 613.

The evidence withheld by the state, upon review of its content, so damages the key witness' testimony and the validity of the jury verdicts, as to both convictions in Case Nos. CRF–79–3717 and CRF–79–3719 that the result of the Petitioner's trial does not comport with the "overriding concern with the justice of the finding of guilt." *U.S. v. Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401. This Court is mindful that a jury has previously found the Petitioner guilty of serious crimes resulting in the death of one police officer and the wounding of another. In doing so the jury rejected the defense of insanity. But it did so without benefit of evidence which clearly should have been provided the Defendant, who repeatedly requested same. Thus, the previous jury did not have the opportunity to weigh this important evidence in evaluating the *only* defense submitted to it by the Court. It is obvious that such evidence, if presented to the jury, might well have changed the outcome of the case.

The federal constitution requires the prosecutor to provide the Defendant the evidence here wrongfully withheld. The state's failure to do so requires this Court to sustain the Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254. The writ is hereby GRANTED invalidating the convictions and sentences imposed upon the Petitioner.

The informations filed in the state court charging Petitioner with murder in the first degree and shooting with intent to kill are not hereby set aside. *Bowen,* 799 F.2d at 614 (citations omitted). Retrial, based on these informations, is barred to the extent that the state cannot try the Petitioner for murder in the first degree; should the state decide to retry the Petitioner for causing the death of Officer Garrison, it is limited to the charge of manslaughter or its lesser included offenses. The Petitioner was initially charged with the greater offense; the jury was instructed as to the greater and lesser offenses and returned a verdict finding the Petitioner guilty of the lesser included offense of manslaughter in the first degree. To try the Petitioner again on the charge of murder would put her twice in jeopardy for the same crime and would be in violation of the double jeopardy clause of the Fifth Amendment. The protection against double jeopardy "is cast in terms of the risk or hazard of trial and conviction, not of the ultimate legal consequences of the verdict. To be charged and to be subjected to a second trial for first degree murder is an ordeal not to be viewed lightly." *Price v. Georgia,* 398 U.S. 323, 331 n. 10, 90 S.Ct. 1757, 1762 n. 10, 26 L.Ed.2d 300 (1970); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

Where the results of the first trial have been invalidated and the Petitioner was initially convicted of the lesser offense, the state is limited on retrial to the lesser offense under federal, circuit and state law. The Petitioner is not required to barter her constitutional protection against a second prosecution for an offense punishable by death as the price of a successful appeal from an erroneous conviction. *Green,* 355 U.S. at 193–194, 78 S.Ct. at 226–227; *Price,* 398 U.S. at 329, 90 S.Ct. at 1761. Law in the Tenth Circuit and in the State of Oklahoma are well established as following the rule articulated in *Green, Price,* and their progeny. *E.g., Ward v. Page,* 424 F.2d 491 (10th Cir.1970); *Booker v. Phillips,* 418 F.2d 424 (10th Cir.1969); *Grizzle v. Turner,* 387 F.Supp. 1 (W.D.Okla.1975); *Price v. State,* 598 P.2d 668 (Okla.Crim.1979); *S.H. v. State,* 555 P.2d 1050 (Okla.Crim.1976); *Patty v. State,* 497 P.2d 478 (Okla.Crim. 1972).

Before the writ issues, the state is provided a reasonable time, sixty (60) days, to permit it to re-try the Petitioner or otherwise correct the constitutional infirmity. *Bowen,* 799 F.2d at 614 n. 12. Should the state fail to act within the prescribed time period, the Court shall issue an order immediately releasing the Petitioner who is presumptively entitled to release having established that her confinement is based on an unconstitutional trial. *Id.; Carter v. Rafferty,* 781 F.2d 993, 994–995 (3rd Cir.1986).